**In re CARDINAL HEALTH, INC.
SECURITIES LITIGATION.**

This Document Relates to:
All Securities Actions.

No. C2–04–575.

United States District Court,
S.D. Ohio,
Eastern Division.

Jan. 26, 2005.

John R. Climaco, Scott D. Simpkins, Climaco, Lefkowitz, Peca, Wilcox & Garofoli LPA–1, Cleveland, OH, David J. Worley, Martin D. Chitwood, Stuart J. Gube, Chitwood & Harley LLP, Atlanta, GA, Marc A. Topaz, Schiffrin & Barroway LLP–1, Bala Cynwyd, PA, Daniel Richard Karon, Weinstein, Kitchenoff, Scarlato, Karon & Goldman Ltd., Cleveland, OH, Patrick G. Warner, David P. Meyer & Associates Co. LPA, Columbus, OH, Melvyn I. Weiss, David Bershad, Peter E. Seidman, Steven G. Schulman, Milberg, Weiss, Bershad, Hynes & Lerach, New York, NY, Robert N. Cappucci, Stephen D. Oestreich, Vincent R. Cappucci, William W. Wickersham, Entwistle & Cappucci LLP, New York, NY, Richard Stuart Wayne, Joseph J. Braun, Strauss & Troy–1, Cincinnati, OH, Darren J. Robbins, Jeffrey W. Lawrence, Ramzi Abadou, William S. Lerach, Lerach, Coughlin, Stoia, Rudman & Robbins, San Diego, CA, Joseph F. Murray, Murray, Murphy, Moul & Basil–2, Daniel N. Abraham, Colley, Shroyer & Abraham Co., L.P.A., David P. Meyer, David P. Meyer & Associates Co. LPA, Columbus, OH, Jack Landskroner, Landskroner–Grieco–Madden, Ltd., Cleveland, OH, Scott E. Smith, Smith, Phillips & Associates Co. LPA, Worthington, OH, Solomon B. Cera, Gold, Bennett, Cera & Sidener, LLP, San Francisco, CA, for Plaintiff.

Geoffrey J. Ritts, John M. Newman, Jr., Jones, Day, Reavis & Pogue, Cleveland, OH, Brian G. Selden, J. Todd Kennard, John Kevin Cogan, Shawn J. Organ, Jones Day, Mark Alan Johnson, Baker & Hostetler–2, Columbus, OH, Paul P. Eyre, Baker & Hostetler, Cleveland, OH, for Defendants.

### ORDER APPOINTING LEAD PLAINTIFF

MARBLEY, District Judge.

## I. INTRODUCTION

This matter comes before the Court on five Plaintiffs' motions to be Lead Plaintiff and

Appoint Lead Counsel for this Consolidated Securities Action against Cardinal Health, Inc. ("Cardinal Health" or "Cardinal" or "the Company") and various related Defendants.[1] The Court **GRANTS** the Pension Fund Group's Motion for Appointment as Lead Plaintiff and Its Selection of Lead Counsel to Consolidate Related Actions [Docket No. 36]; **DENIES** the State of New Jersey's Motion for Appointment as Proposed Lead Plaintiff and For Approval of Selection of Counsel [Docket No. 23]; **DENIES** First New York LLC's Motion for Appointment as Lead Plaintiff and Approval of Its Selection of Co–Lead and Liaison Counsel [Docket No. 31]; **DENIES** Wood Asset Management's Motion to Appoint Counsel Gold Bennett Cera & Sidener LLP, as Lead Counsel and Wood Asset Management, Inc. as Lead Plaintiff [Docket No. 17]; **DENIES** the Engel Family Trust's Motion for an Order to Appoint The Engel Family Trust Lead Plaintiff and Approval of Lead Counsel [Docket No. 30].

## II. SUMMARY OF PENDING ACTIONS AND UNDERLYING FACTS

Taking the facts as stated by the Plaintiffs, these securities fraud class actions have been brought against Cardinal Health and related Defendants on behalf of all persons who purchased the publicly traded securities of Cardinal Health, Inc. from October 24, 2000 to July 26, 2004 ("the Class Period").[2] Cardinal Health is a holding company encompassing a number of operating subsidiaries that do business as Cardinal Health. It is a provider of products and services supporting the healthcare industry. During the Class Period, Defendants allegedly caused Cardinal Health's shares to trade at artificially inflated levels through the issuance of false and misleading financial statements, by using questionable inventory practices, and by pre-

maturely recording approximately $22 million in the December 2000 and September 2001 quarters for a law suit settlement, which did not actually settle until mid–2002. These various manipulations were aimed to meet Wall Street analysts' earnings targets for December 2000 and September 2001. Taking advantage of the inflation of Cardinal's stock caused by their false statements, Cardinal insiders allegedly sold over 2.2 million shares of their own Cardinal stock at artificially inflated prices, reaping gross proceeds in excess of $152 million.

On October 7, 2003, however, Cardinal received a request from the Securities and Exchange Commission ("SEC"), in connection with an informal inquiry, for historical financial and related information, including Cardinal's accounting records for fiscal 2001 through fiscal 2003, as well as notes, memoranda, presentations, e-mail and other correspondence, budgets, forecasts and estimates. Since October 2003, Cardinal has been collecting and providing to the SEC documents responsive to the October request.

In April 2004, the Company's audit committee began an internal review and retained independent counsel to investigate certain accounting matters. On May 6, 2004, the Company was notified that the pending SEC inquiry had been converted into a formal investigation. This information was disclosed to the public on May 14, 2004. On June 30, 2004, Cardinal issued a press release and later conducted a conference call for analysts that disclosed a significant earnings shortfall, due in part to "a faster elimination of inventory investment opportunities," and disclosed that Cardinal had received a subpoena from the SEC that "included a request for the production of documents relating to revenue classification,

---

1. This Court consolidated ten securities actions into one Consolidated Securities Action. *In re Cardinal Health, Inc. Sec. Litig.*, No. C2–04–575 (Dec. 16, 2004) (consolidating *Burger v. Cardinal Health, Inc.*, No. C2–04–575; *Fener v. Cardinal Health, Inc.*, No. C2–04–579; *Senn v. Cardinal Health, Inc.*, No. C2–04–597; *Kim v. Cardinal Health, Inc.*, No. C2–04–598; *Arace v. Cardinal Health, Inc.*, No. C2–04–604; *Hessian v. Cardinal Health, Inc.*, No. C2–04–635; *Constance Matthews Living Trust v. Cardinal Health, Inc.*, No. C2–04–636; *Mariss Partners v. Cardinal Health,*

*Inc.*, No. C2–04–649; *New Jersey v. Cardinal Health, Inc.*, No. C2–04–831; *First New York Securities LLC v. Cardinal Health, Inc.*, No. C2–04–911).

2. Any differing opinions on Class Period length can be resolved on the filing of the consolidated complaint by the appointed Lead Plaintiff. *In re Enron Corp. Sec. Litig.*, 206 F.R.D. 427, 448 n. 15 (S.D.Tex.2002).

and the methods used for such classification, in the company's pharmaceutical distribution business as either operating revenue or revenues from bulk deliveries to customer warehouses." That day, the company also disclosed that the United States Attorney's Office for the Southern District of New York had commenced an investigation on the same subject. In response the stock fell by $17.19 per share, more than 24%, in the next day's trading.

On July 26, 2004, after the market closed, the Company announced that its Chief Financial Officer, Richard Miller, had resigned and that the company would be delaying the release of its Fourth Quarter and Fiscal Year 2004 annual results until August or early September. When Cardinal Health stock resumed trading on July 27, 2004, the company's stock fell by $6.47 to close at $44.00, a single day decline of 13%. Since Miller's resignation, the stock has remained at approximately $45.00 per share.

The first motion in this case was filed in this Court on July 2, 2004 pursuant to the Private Securities Litigation Reform Act ("PSRLA"). 15 U.S.C. § 78u–4. *Gerald Burger et al. v. Cardinal Health,* Case No. 04–575, 2004 WL 2301110 (complaint filed July 2, 2004). Upon filing the Complaint, counsel also published the required notice to members of the purported class, which advised class members of the existence of the lawsuit and described the claims asserted. 15 U.S.C. § 78u–4(a)(3)(A)(i). It also advised class members of their right to file a motion for Lead Plaintiff no later than August 31, 2004. 15 U.S.C. § 78u–4(a)(3)(A)(i)(II) ("[N]ot later than 60 days after the date on which the notice is published, any member of the purported class may move the court to serve as lead plaintiff of the purported class.").

The following Lead Plaintiff candidates have emerged:[3]

1. State of New Jersey, Department of Treasury, Division of Investment ("New Jersey");

2. First New York Securities, LLC ("First New York");

3. The Pension Fund Group ("Pension Fund Group" or "PFG");

4. Wood Asset Management, Inc. ("Wood Asset Management"); and

5. Engel Family Trust[4]

On December 16, 2004, the Court entered an order consolidating all securities actions. On January 11, 2005, the Court held a hearing during which each of the proposed Lead Plaintiffs had an opportunity to present its arguments. The Court has reviewed the parties' motions, responses, and replies thereto, and has fully considered the arguments heard at oral argument.

## III. ANALYSIS

### A. Legal Framework of the PSLRA

The PSLRA requires that the Court appoint a lead plaintiff during the initial stages of litigation. If an action has been consolidated, the court shall appoint a lead plaintiff "as soon as practicable" after the consolidation. 15 U.S.C. § 78u–4(a)(3)(B)(ii). The PSLRA further dictates that the chosen lead plaintiff be able to represent adequately the interests of the class members.

> [T]he court ... shall appoint as lead plaintiff the member or members of the purported plaintiff class the court determines to be most capable of adequately representing the interests of class members (hereinafter in this paragraph referred to as the "most adequate plaintiff").

15 U.S.C. § 78u–4(3)(B)(i). The PSLRA requires that any plaintiff seeking to be lead plaintiff file a certification that must state the following:

> (i) ... the plaintiff has reviewed the complaint and authorized its filing;

---

**3.** Two other candidates, The Public Employees' Retirement System of Mississippi ("MPERS") and the Devine Group, originally moved to be Lead Plaintiff. Both entities have since withdrawn.

**4.** The Engel Family Trust filed its motion with an entity known as Pacific Southwest Funding Corp. The latter withdrew from the motion on September 8, 2004.

(ii) ... the plaintiff did not purchase the security that is the subject of the complaint at the direction of plaintiff's counsel or in order to participate in any private action arising under this chapter;

(iii) ... the plaintiff is willing to serve as a representative party on behalf of a class, including providing testimony at deposition and trial, if necessary.

15 U.S.C. § 78u–4(a)(2)(A)(i)–(iii).

The certification must also include a list of the plaintiffs' transactions in the stock, a list of all actions in which that plaintiff has served as lead plaintiff in the past three years, and a statement that the plaintiff will not accept payment for serving as a representative party in excess of plaintiff's pro rata share. 15 U.S.C. § 78u–4(a)(2)(A)(iv)–(vi).

■ To determine which candidate should be Lead Plaintiff, the Court engages in a two-step inquiry, calculating which candidate has the largest financial interest, and then determining whether that candidate meets the typicality and adequacy requirements of Rule 23(a). *See In re Cavanaugh*, 306 F.3d 726, 730 (9th Cir.2002) (explaining the two-step inquiry). Indeed, the statute presumes that the most adequate plaintiff is the person or group of persons that has the largest financial interest in the relief sought by the class and that otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

> [T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this chapter is the person or group of persons that—
>
> (aa) has either filed the complaint or made a motion in response to a notice under subparagraph (A)(I);

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.[5]

15 U.S.C. § 78u–4(a)(3)(iii)(I)(bb).

Although it is presumed that the candidate who has the largest financial interest and who meets the Rule 23(a) requirements should be the lead plaintiff, this presumption can be overcome by a showing that the candidate will be subject to unique defenses or is otherwise inadequate. 15 U.S.C. § 78u–4(a)(3)(iii)(II).

> The presumption described in subclause (I) may be rebutted only upon proof by a member of the purported plaintiff class that the presumptively most adequate plaintiff—
>
> (aa) will not fairly and adequately protect the interests of the class; or
>
> (bb) is subject to unique defenses that render such plaintiff incapable of adequately representing the class.

15 U.S.C. § 78u–4(a)(3)(iii)(II).

### B. Largest Financial Interest[6]

The PSLRA provides no definitive method for determining the largest financial interest, but the competing Lead Plaintiff candidates in the case sub judice have proposed two competing methodologies: the First In First Out ("FIFO") method and the so-called four-factor inquiry, which typically adopts the Last In First Out ("LIFO") method to calculate the approximate loss.

Both New Jersey and the Pension Fund Group calculate their losses using the FIFO method, which calculates loss in the following

---

**5.** Federal Rule of Civil Procedure 23(a) provides that a party may serve as a class representative only if the following four requirements are satisfied: (1) numerosity; (2) common questions of law or fact; (3) typicality of claims or defenses; and (4) the representative parties will fairly and adequately protect the interests of the class. Fed.R.Civ.P. 23(a). The third and fourth prerequisites, typicality and adequacy, are of primary importance with regard to lead plaintiff determinations.

**6.** The Court notes that any discussion about loss, either at the January 11, 2005 oral argument or in this Order, is limited to the Lead Plaintiff motions, and does not impact the ultimate questions of liability on damages. *See generally In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 03–2166, slip op. at 5 (N.D.Ohio May 12, 2004) (stating that the lead plaintiff analysis "is limited to resolving the lead plaintiff motions, and is not an ultimate determination of liability and damages").

manner: the first shares sold are matched against the first shares purchased. If the "first shares purchased" are pre-class period purchases, then the first shares sold are matched against these pre-class purchases and the resulting gain or loss is excluded from the loss calculation. Thereafter, class period sales are matched against class period purchases to calculate losses. For any shares retained at the end of the class period, those shares are assigned a value, often a 60–day or 90–day post-fraud disclosure average. Using FIFO, the claimed losses of each entity are as follows:

FIFO (in order of approximate claimed loss)

| Proposed Lead Plaintiff | Approximate Loss |
| --- | --- |
| 6. Pension Fund Group | $15.1 million |
|    a. Amalg'd Bank | $ 3.2 million |
|    b. Cal. Iron | $ 1.4 million |
|    c. Central States | $ 2.1 million |
|    d. PACE | $ 1.9 million |
|    e. New Mexico PERA | $ 1.9 million |
|    f. New Mexico SIC | $ 4.6 million |
| 7. New Jersey | $13.0 million |
| 8. First New York | $ 8.6 million |
| 9. Wood Asset Management | $ 4 million |
| 10. Engel Family Trust | $23,000 |

Both candidates point to cases supporting FIFO's use. *See, e.g., Plumbers and Pipefitters Local 572 Pension Fund v. Cisco Sys., Inc.*, No. C01–20418–JW, slip op. at 5, 6–7 (N.D.Cal. May 27, 2004) ("[E]very time Plaintiffs purchased stock at an allegedly inflated price during the Class period, they were arguably injured at the moment of the purchase, notwithstanding earlier or later sales.... Plaintiffs seek damages consistent with the first-in-first-out ('FIFO') accounting method, which has been established as a legitimate method for computing losses or gains from stock purchases or sales."); *In re Schering–Plough Corp. Sec. Litig.*, Master File No. 01–CV–0829, slip op. at 14 (D.N.J. Oct. 10, 2003) (finding FIFO an acceptable method of loss calculation at the class certification stage).

The Pension Fund Group also suggests that a hard and fast rejection of the FIFO methodology would be at odds with the PSLRA's preference that institutional investors serve as lead plaintiffs. PFG argues that FIFO often favors institutional investors because these institutions typically hold large blocks of stock that were acquired prior to the alleged fraud.

First New York, on the other hand, strongly disagrees with using the FIFO methodology and claims that FIFO effectively eliminates the losses of parties who have significant intra-Class Period sales and significant pre-Class Period holdings. First New York argues that the loss calculations adduced by New Jersey and PFG exemplify the accounting machinations possible under FIFO, asserting that both New Jersey and two members of PFG did not incorporate any receipts from sales of stock purchased prior to the Class Period. First New York vehemently objects to the mathematical "zeroing out" of intra-Class Period sales simply because those shares were purchased before the Class Period began.

To ameliorate the accuracy of these loss calculations, First New York advocates using the a four-factor inquiry instead of FIFO. The four-factor inquiry involves the following indicators: (1) the number of shares purchased during the Class Period; (2) the number of net shares purchased during the Class Period; (2) the total net funds expended during the Class Period; and (4) the approximate losses suffered during the Class Period. *Manual for Complex Litigation* § 31.31 (4th ed.2004); *see also Goodyear*, No. 03–2166, slip op. at 5 (outlining the four factors).

The four-factor inquiry has been widely accepted in the case law and various treatises because it provides courts with additional information. *See Manual for Complex Litigation* § 31.31 (finding the four factors helpful "because they look to relatively objective indicators ... rather than to the ultimate question of damages") (citing *Aronson v. McKesson HBOC, Inc.* 79 F.Supp.2d 1146, 1158 (N.D.Cal.1999)). Additionally, the four-factor inquiry reveals whether plaintiffs actually profited during the Class Period from the inflated stock prices. For example, in *In re Comdisco Securities Litigation*, 150 F.Supp.2d 943 (N.D.Ill.2001), the Pennsylvania State Employees' Retirement Systems ("PASERS") stated that it purchased 250,000 shares of Comdisco during the class period and lost $2.4 million. A competing plaintiff, however, explained to the court that although PASERS purchased 213,800 shares during class period, by far the largest total of any

single investor, it also sold 218,400, with a net gain overall. *Id.* at 945–46. Similarly, in *Goodyear*, the Court reproved one lead plaintiff's candidate's attempts to hide its gains using the FIFO methodology. *In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 03–2166, slip op. at 7 (N.D.Ohio May 12, 2004). There, the candidate purchased about fifty percent less shares than it sold and made over $12 million. *Id.*

The fourth factor was heavily debated by competing Lead Plaintiff candidates, in part, because the Sixth Circuit has not yet defined approximate loss in the context of a lead plaintiff motion. This Court, however, finds persuasive the recent opinion in *Thompson v. Shaw Group*, No. Civ.A.04–1685, 2004 WL 2988503, at *4 (E.D.La. Dec.14, 2004). There, the court contrasted FIFO and LIFO, explaining that the latter is often incorporated into the four-factor inquiry. The court explained that "under the LIFO approach, a plaintiff's sales of the defendant's stock during the class period are matched against the last shares purchased, resulting in an off-set of class-period gains from a plaintiff's ultimate losses." *Id.; see also In re Comdisco Sec. Litig.*, No. 01 C 2110, 2004 WL 905938, at *3 (N.D.Ill. Apr.26, 2004) ("the focal point of inquiry must begin … with purchases or sales—or both—during that class period … which is consistent with LIFO rather than FIFO treatment").

The Lead Plaintiff candidates did not provide the Court with a breakdown of losses under LIFO.[7] In the case sub judice, however, the parties have provided the Court with enough information to conclude that the designated Lead Plaintiff is the same under either methodology. *In re Royal Ahold N.V. Sec. & ERISA Litig.*, 219 F.R.D. 343, 350 (D.Md.2003) ("If a definitive determination of financial interest were required, the court might well have to request additional documentation …, however, the lead plaintiff selection will be determined on other factors."). Thus, the Court "resorts" to the

FIFO methodology for the "immediate narrow purpose" of evaluating the plaintiffs in an order. *Shaw*, 2004 WL 2988503, at *5. The Court notes that this use of FIFO in no way demonstrates a modicum of approval of FIFO. *Id.; see generally Comdisco*, 2004 WL 905938, at *2 (dispelling the myth that the Internal Revenue Service's use of FIFO should dictate its use in securities actions).

## C. RULE 23—TYPICALITY AND ADEQUACY OF REPRESENTATION

Rule 23(a) provides that a party may serve as a class representative only if the following four requirements are satisfied:

▇ the class is so numerous that joinder of all members is impracticable, (2) there are questions of law or fact common to the class, (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class, and (4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23(a)

Only two of the four prerequisites, typicality and adequacy, directly address the personal characteristics of class representatives. *See Lax v. First Merch. Acceptance Corp.*, No. 97 C 2715, 1997 WL 461036, at *6 (N.D.Ill. Aug.6, 1997) (focusing the inquiry on typicality and adequacy).

▇ The typicality requirement of Fed.R.Civ.P. 23(a)(3) is fulfilled if the prospective lead plaintiff's claims arise out of the same course of conduct or series of events and are based on the same legal theory as the other members of the class. *In re American Medical Sys.*, 75 F.3d 1069, 1082 (6th Cir.1996) ("A Plaintiff's claim is typical if it arises from the same event or practice or course of conduct that gives rise to the claims of other class members, and if his or her claims are based on the same legal theory.").

▇ A plaintiff can show that it fairly and adequately represents the interests of the

---

7. First New York's calculations of the competing movants' approximate loss are not entirely LIFO-based. For example, First New York asserts that New Jersey actually gained $21 million during the Class Period. *Reply Memorandum of Law of First New York Securities LLC in Further Support*

*of its Motion for Appointment as Lead Plaintiff*, at 10, 12 (filed Oct. 8, 2004). First New York's Reply Memorandum notes that the method used to calculate this loss was a novel one and, in fact, deviates from the four-factor test. *Id.* at 10 n. 15.

class, pursuant to Rule 23(a)(4), if it appears that (1) plaintiff's interests are not antagonistic to those of the class they seek to represent and (2) plaintiff's counsel is qualified to conduct the litigation. *In re CMS Energy Sec. Litig.*, No. 02–CV–72004–DT, slip op. at 5 (E.D.Mich. Nov. 14, 2002) (applying these two factors).

■ The PSLRA vests authority in the lead plaintiff to select and retain counsel to represent a putative class, subject to court approval. 15 U.S.C. 78u–4(a)(3)(B)(v) ("The most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class."). Courts typically do not disturb a lead plaintiff's choice of counsel unless doing so is necessary to protect the interests of the class. *See Cavanaugh*, 306 F.3d 726, 733 (9th Cir.2002) ("[T]he district court must approve the lead plaintiff's choice of counsel, but Congress gave the lead plaintiff, and not the court, the power to select a lawyer for the class."). The presumption that a lead plaintiff fulfills the typicality and adequacy requirements can be rebutted by a showing that the plaintiff is in fact not adequate or will be subject to unique defenses. *See, e.g., See In re Network Assoc., Inc. Sec. Litig.*, 76 F.Supp.2d 1017, 1029 (N.D.Cal.1999) (holding presumptive lead plaintiff inadequate due to unrelated fraud investigation).

### 1. The Pension Fund Group

The Pension Fund Group is an aggregated group of the following six large and sophisticated investors with prior securities litigation experience:

11. New Mexico State Investment Council ("New Mexico SIC");

12. New Mexico Public Employees Retirement Association of New Mexico ("New Mexico PERA");

13. Amalgamated Bank, as Trustee for LongView Collective Investment Fund etc., Longview 600 Small Cap Collective Fund, LongView VEBA 500 and LongView Quantitative Fund ("Amalgamated Bank");

14. PACE Industry Union Management Pension Fund ("PACE");

15. California Ironworkers Field Trust Funds ("California Ironworkers"); and

16. Central States Southeast and Southwest Area Pension Fund ("Central States").

The Pension Fund Group claims the largest loss and asserts that it fulfills both the typicality and adequacy requirements of Rule 23(a). PFG notes that its claims are typical of the class's claims because PFG will allege that Cardinal Health and related Defendants publicly disseminated false and misleading statements and issued securities pursuant to false SEC filed registration statements.[8] *See generally In re American Medical Sys.*, 75 F.3d 1069, 1082 (6th Cir.1996) (finding the typicality element of Rule 23(a)(3) satisfied if the lead plaintiff's grievances arise from the "same event or practice or course of conduct" as other class members and is "based on the same legal theory").

With regard to the adequacy requirement under 23(a)(4), PFG argues that its interests are in no way antagonistic to those of the putative class. PFG also asserts that its chosen counsel, Lerach Coughlin Stoia Geller Rudman & Robbins LLP ("Lerach Coughlin"), is qualified and capable of handling a case of this magnitude and complexity.

The Court finds that the Pension Fund Group has adequately met the typicality and adequacy requirements. Its claims are typical of the putative class's claims, its interests are not antagonistic to the class, and its chosen counsel are qualified and competent. The Court also notes that the members of the aptly-named Pension Fund Group are public institutional investors, which comports

---

**8.** At oral argument, the Pension Fund Group asserted that it, alone, has standing to bring a Section 11 claim under the Securities Exchange Act of 1933 because Amalgamated Bank, one of PFG's members, acquired, as opposed to purchased, Cardinal Health. Securities Exchange Act of 1933 § 11, 15 U.S.C. § 77k. The Court notes that this argument was not considered in the determination of Lead Plaintiff. Contrary to the Pension Fund Group's assertions, the Court is quite confident that any other Lead Plaintiff would have been able to locate a Plaintiff with Section 11 standing.

with the PSLRA's expressed preference for such lead plaintiffs. The PSLRA's legislative history explains as follows: "[t]he pension funds accounting for $4.5 trillion or nearly half of the institutional assets, in many cases the beneficiaries of pension funds—small investors—have the greatest stake in the outcome of the lawsuit." H.R. Conf. Rep. No. 104–369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730–34; *see also In re Vicuron Pharm. Sec. Litig.*, NO. CIV. A.04–2627, 225 F.R.D. 508, 511, 2004 WL 2983940, at *3 (E.D.Pa. Oct.7, 2004) (holding that one candidate's status as a pension fund tipped the scales in favor of its appointment as lead plaintiff); *see also In re Royal Ahold N.V. Sec. & ERISA Litig.*, 219 F.R.D. 343, 350–51 (D.Md.2003) (noting that one candidate satisfied the typicality and adequacy inquiry, in part, because it was a "large sophisticated financial investment institution with the resources to support a long and complex litigation"). Likewise, the Court finds the Pension Group Fund's members to be well-grounded and sophisticated institutional investors that can commit substantial resources to this litigation.

The other Lead Plaintiff candidates attack PFG, arguing that it will be subject to unique defenses on two fronts. First, competing movants argue that the Pension Fund Group is inadequate because it is an ad hoc amalgamation of basically unrelated funds that have been packaged together by Lerach Coughlin. Second, competing Plaintiffs argue that two members of the Pension Fund Group, Central States and New Mexico PERA, are net gainers because they appear to have ended the Class Period with a positive balance, arguably making them atypical investors and begging the question of whether these entities were actually damaged by the alleged fraud.

### a. Aggregated Group of Funds

■ Competing movants maintain that groups formed for the purposes of amassing the largest losses should not be considered to have the largest financial interest because these groups epitomize the type of lawyer-driven litigation reviled by the PSLRA. *In re Telxon Corp. Sec. Litig.*, 67 F.Supp.2d 803, 815–16 (N.D.Ohio 1999) (denying lead plain-

tiff status to the Alsin Group, which contained eighteen investors who had no relation to one another, and deeming such an amalgamation of random people "inconsistent with the definition of group intended by the PSLRA, as revealed by the statute's language, context, overall scheme, and purpose"); *see also Crawford v. Onyx Software Corp.*, No. C01–1346L, 2002 WL 356760, at *2 (W.D.Wash. Jan.10, 2002) (refusing to designate a movant group of three individuals lead plaintiff because "their decision making requires either (a) levels of coordination, negotiation, and collective action which far exceed that which would be necessary of an individual litigant or (b) undue control by their lawyer-representatives"). Although competing movants concede that small groups can pass muster if adequate procedures exist for communication and general decision-making, the Pension Fund Group's detractors argue that it has fallen short of the required level of cohesiveness.

PFG argues that small groups of funds are not only acceptable, but are actually welcomed and anticipated by the statute, which provides as follow:

> [Courts] shall appoint as lead plaintiff the member *or members* of the purported plaintiff class that the court determines to be most capable of adequately representing the interests of class members (hereafter in this paragraph referred to as the "most adequate plaintiff") in accordance with this subparagraph.

15 U.S.C.A. § 78u–4(a)(3)(B)(i). PFG points to several cases allowing a group to be lead plaintiff. *See generally In re Cendant Corp. Litig.*, 264 F.3d 201, 268 (3rd Cir.2001) (affirming the district court's choice of a group composed of the three largest pension funds in the United States, finding "no indication that the CalPERS Group [a group of three funds: two from New York and one from California] was artificially created by its lawyers," and finding that "its members could operate effectively as a single unit"). Moreover, PFG distinguishes *In re Telxon* by pointing out *Telxon* and much of its progeny have dealt with extremely large groups of investors. *Telxon*, 67 F.Supp.2d at 815–16 (refusing a group of 18 individual unrelated

investors lead plaintiff status); *In re Advanced Tissue Sciences Sec. Litig.*, 184 F.R.D. 346, 352 (S.D.Cal.1998) (refusing to aggregate 250 or 165 members); *Aronson v. McKesson HBOC, Inc.*, 79 F.Supp.2d 1146 (N.D.Cal.1999) (refusing to aggregate 4,000 plaintiffs). The Pension Fund Group also suggests that an unwavering focus on whether the funds have a pre-existing relationship is myopic because the crucial question is the group's ability to make decisions, communicate, and represent the class. In this vein, PFG assures this Court that its members have indeed established a cohesive relationship. *Pension Fund Group's Joint Declaration in Support of its Motion for Appointment as Lead Plaintiff and Approval of its Selection as Lead Counsel,* ¶¶ 9, 11 (filed Oct. 8, 2004).

This Court recognizes that a stated goal of Congress in passing the PSLRA was to prevent lawyer-driven litigation. *In re Donnkenny, Inc. Sec. Litig.*, 171 F.R.D. 156, 157–58 (S.D.N.Y.1997) (refusing aggregation). Congress recognized that if lawyers could gather a group of unrelated plaintiffs and aggregate their financial losses, then lawyers would be encouraged to commence and direct the litigation, leaving the plaintiffs with little control. *Id.*

The Court finds a case-by-case evaluation of aggregation, which has been suggested by several courts and by the SEC, to be a more appropriate way to determine whether aggregation is appropriate. The Court in *In re Office Max, Inc. Securities Litigation,* which narrowed *Telxon,* adopted the following standard:

> The Court must examine each proposed lead plaintiff group on a case by case basis, assessing the size of the group, the purpose for adding any particular individual or entity to the group and the likelihood that the group, as constituted effectively, could serve the lead plaintiff function contemplated by the PSLRA.

*In re Office Max, Inc. Sec. Litig.,* No. 1:00cv2432, slip op. at 13–14 (N.D.Ohio Mar. 21, 2001) (explaining that *Telxon* had been interpreted in too sweeping a manner).[9] Similarly, the court in *In re Versata, Inc.*

*Securities Litigation,* No. C 01–1439, 2001 WL 34012374, at *5 (N.D.Cal. Aug.20, 2001), found requiring a pre-litigation relationship "too rigid" because "[t]he beneficial characteristics sought in a group with a pre-existing relationship—cohesiveness, an ability to direct litigation, and collective confluence with the interests of the class—can be found in unrelated groups on a case-by-case basis." *See also Local 144 Nursing Home Pension Fund v. Honeywell Int'l, Inc.,* No. 00–3605(DRD), 2000 WL 33173017, at *5 (D.N.J. Nov.16, 2000) ("Rather, what is required when considering whether to appoint a group of investors is whether that group will be able to manage effectively the litigation."); *In re MicroStrategy Sec. Litig.,* 110 F.Supp.2d 427, 435 (E.D.Va.2000) (finding the case-by-case approach allows a district court maximum flexibility to select a lead plaintiff who will best represent the interests of the class); *In re Baan Co. Sec. Litig.,* 186 F.R.D. 214, 216–17 (D.D.C.1999) ("The Lead Plaintiff decision should be made under a rule of reason but in most cases three should be the initial target, with five or six as the upper limit.").

The SEC has also sanctioned small groups, stating that "a small number capable of effectively managing the litigation and exercising control over counsel" is typically acceptable. *Memorandum of the Securities and Exchange Commission, Amicus Curiae Introduction and Summary of the Commission's Position,* at 1, *In re Baan Co. Sec. Litig.,* 186 F.R.D. 214 (D.D.C.1999).

The Court finds that the Pension Fund Group to be a permissible aggregation. First, it is comprised of a small group of investors, each of whom is a sophisticated investor. Second, PFG has adduced information about its proposed manner of communication and decision-making. At oral argument, counsel for PFG explained that the clients' common goals in pursuing this litigation had resulted in a harmonious relationship among the group: "I'm unaware, and I know these clients pretty well, of any conflicting procedures or protocols that they have. We have worked with them in this

---

9. The Honorable Kathleen M. O'Malley authored both *Telxon* and *Office Max.*

case to date very cohesively with no difficulties whatsoever." *Transcript of Oral Argument* at 47 (filed Jan. 20, 2005). Moreover, Counsel for PFG provided the Court with information about PFG's procedural mechanisms for case management, stating, "[t]he clients themselves have agreed that they will have periodic conference calls ... [and] I believe that their current intention is to make decisions through consensus and agreement as opposed to voting, but ultimately they will be the masters of how decisions are to be made." *Id.* at 51. Third, the Court finds that PFG and its counsel will represent deftly the class's interests.

### b. Net Gainers

Competing movants contend that even if the Court permits aggregation, the Pension Fund Group will be subject to the unique defense that two of its members, New Mexico PERA and Central States, experienced a net gain at the Class Period's end and, thus, were not damaged by the fraud. As competing movants correctly argue, courts usually reject these so-called net gainers as lead plaintiffs, opting instead for net losers that will have less trouble proving damages. *Goodyear,* No. 03–2166, slip op. at 7 (rejecting net seller as lead plaintiff); *Comdisco,* 150 F.Supp.2d 943, 945–46 (finding a pension fund "out of the running for designation of lead plaintiff" because it "derived a *net gain* of almost $300,000 ... from its purchases and sales during the Class Period"); *see also In re McKesson HBOC, Inc. Sec. Litig.,* 97 F.Supp.2d 993, 996–97 (N.D.Cal.1999) (rejecting the net seller and finding that a net purchaser would presumably have more interest in the litigation because "he or she was induced by the fraud to purchase shares and has been left 'holding the bag' when the fraudulent inflation is revealed").

Indeed, a closer look at the Pension Fund Group's transaction register reveals that New Mexico PERA reported a loss of approximately $1.9 million, but actually had a net gain of approximately $7 million when sales of pre-Class Period holdings are counted. Similarly, Central States reported a loss of approximately $2.1 million, but actually had a net gain of approximately $4.7 million when sales of pre-Class period holdings are

incorporated. Thus, the Court agrees with the concerns set forth by the competing movants with regard to Central States and New Mexico PERA: proving damages and typicality will be the bête noir of these two entities. The Court anticipated this problem at oral argument and asked Counsel for PFG whether removing New Mexico PERA and Central States from PFG would be a possible solution. Counsel for PFG answered in the affirmative. *Transcript of Oral Argument* at 55.

A group vying for lead plaintiff status does not necessarily rise and fall as a group. Segmentation is a viable remedy and finds support in the case law. *In re Surebeam Corp. Sec. Litig.,* No. 03CV 1721, 2003 U.S. Dist. LEXIS 25022, at *23 (S.D.Cal. Jan. 5, 2004). There, the court found one member of the presumptive lead plaintiff, FMC Pension Group, inadequate because of its securities industry misconduct. The court explained that it had the authority to "break apart a proposed group in search of the most adequate lead plaintiff." *Id.; see also Newman v. Eagle Bldg. Tech.,* 209 F.R.D. 499, 505 (S.D.Fla.2002) (holding that one member's inadequacy is not imputed to the rest of the group, noting that the remainder of the group still claimed a financial interest of well over $1 million); *In re Razorfish, Inc. Sec. Lit.,* 143 F.Supp.2d 304, 311 (S.D.N.Y.2001) (finding a proposed large group unwieldy and designating one member of that group to act as lead plaintiff).

The Court, therefore, eliminates New Mexico PERA and Central States, the two net gainers and net sellers, from PFG. After these two members are dropped from the presumptive pack, Pension Fund Group has four members and now has a claimed loss of $11.1 million, which is less than New Jersey's claimed loss, leaving New Jersey with the largest financial interest. For the reasons stated below, however, the Court finds New Jersey subject to unique defenses and, thus, not an adequate Lead Plaintiff.

### 2. New Jersey Department of Treasury

The competing movants attack New Jersey on two bases. First, competing movants assert that New Jersey is a professional plaintiff, which has served as Lead Plaintiff more

than five times in the last three years, in violation of 15 U.S.C. § 78u–4(a)(3)(B)(vi). Second, the other candidates assert that New Jersey will not be an adequate class representative because of its questionable trading patterns in Cardinal Health.

#### a. Professional Plaintiff Restrictions

In a subparagraph titled "Restrictions of Professional Plaintiffs," the PSLRA provides as follows:

> Except as the court may otherwise permit, consistent with the purposes of this section, a person may be lead plaintiff ... in no more than 5 securities class actions ... during any 3–year period.

15 U.S.C. § 78u–4(a)(3)(B)(vi).

Competing movants argue that New Jersey cannot serve as Lead Plaintiff both because it has served as lead plaintiff more than five times in any three year period and because it is overextended. New Jersey argues that the it has ample resources to spread out over the six cases in which it is currently serving as lead plaintiff, and notes that the State of New Jersey has enlisted a so-called "Special Master" who personally supervises and monitors the prosecution of each of the securities class actions in which New Jersey is serving as lead plaintiff. New Jersey also argues that a public pension fund should be exempted from this limit because the PSLRA's legislative history favors such funds as ideal lead plaintiffs.[10]

There is a split of authority over whether and when the presumption should be rebutted if an institutional investor, like New Jersey, is seeking lead plaintiff status. *Compare In re Telxon Corp. Sec. Litig.*, 67 F.Supp.2d 803, 820 (N.D.Ohio 1999) (barring the Florida State Board of Administration ("FSBA") from serving as lead plaintiff because it had served or was serving as lead plaintiff in five other securities class actions in three years) and *Aronson v. McKesson HBOC, Inc.*, 79 F.Supp.2d 1146, 1156 (N.D.Cal.1999) (disqualifying pension fund from lead plaintiff position because of its six other lead plaintiff roles), *with Piven v. Sykes Enters., Inc.*, 137 F.Supp.2d 1295, 1304–05 (M.D.Fla.2000) (finding a pension fund overcame presumption because no clear consensus existed in the courts, the PSLRA clearly grants courts the discretion to override the statutory prohibition, and Congress was less concerned about an institutional investor taking the lead several times than, e.g., a shell corporation created only for the purpose of "marshaling claims to be asserted in a class action").

Most courts agree that although the PSLRA expresses a clear preference for institutional investors, there is not a blanket exception allowing institutional investors to be lead plaintiff if they are serving in more than five securities class actions. The statute is clear that the court has the discretion to allow an institutional investor to take on an additional case. *See Telxon,* 67 F.Supp.2d at 821 (minimizing the import of a conference report stating institutional investors may need to exceed this limitation and finding that "if Congress had intended to grant a blanket exemption form operation of the rule to institutional investors ... it could easily have stated" as such).[11]

In the case of an institutional investor, as opposed to the type of plaintiff who haphazardly marshals claims to bring several class actions, the crucial question seems to be whether the institution and its proposed counsel have ample resources to represent adequately the class. New Jersey facilely answered the Court's questions about its ability to handle several lead plaintiff roles,

---

**10.** H.R. Conf. Rep. No. 104–369, at 34 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730–34 ("The pension funds accounting for $4.5 trillion or nearly half of the institutional assets, in many cases the beneficiaries of pension funds—small investors—have the greatest stake in the outcome of the lawsuit.").

**11.** The legislative history states as follows:
Institutional investors seeking to serve as lead plaintiff may need to exceed this limitation and do not represent the type of professional plaintiff this legislation seeks to restrict. As a result, the Conference Committee grants courts discretion to avoid the unintended consequences of disqualifying institutional investors from serving more than five times in three years.
H.R. Conf. Rep. No. 104–369, at 35 (1995), *reprinted in* 1995 U.S.C.C.A.N. 730–34.

explaining that the Plaintiff had already dedicated substantial resources and planned to continue the diligent pursuit of the Cardinal litigation. Additionally, New Jersey's comprehensive submissions to this Court belied any accusation that either New Jersey or its Counsel was overstretched by other litigations.

### b. New Jersey's Trading Patterns

Second, competing movants argue that New Jersey will be subject to a unique defense because its trading pattern undermines its claims that it relied on an integrity-based market. As argued by the opposing movants at oral argument, New Jersey sold 437,000 shares in 2001. New Jersey did not trade in Cardinal Health stock again until April 27, 2004. From April 27 through July 1, 2004, New Jersey purchased 705,000 shares of Cardinal stock. Competing movants argue that this buying spree coincides too neatly with Cardinal's disclosure of the investigations into its accounting methods. On May 14, 2004, Cardinal Health publicly stated that the pending SEC inquiry had been converted into a formal investigation. On June 30, 2004, Cardinal Health publicly disclosed a significant earnings shortfall, the existence of an SEC subpoena regarding its revenue accounting methods, and an investigation into the same by the United States Attorney's Office for the Southern District of New York. The next day, New Jersey purchased 170,000 shares of Cardinal.

The Sixth Circuit has found that reliance on an integrity-based market is presumed if the following five elements of this so-called fraud-on-the-market presumption are met: (1) the defendants made public misrepresentations; (2) the misrepresentations were material; (3) the stock was traded on an efficient market; (4) the misrepresentations would induce a reasonable, relying investor to misjudge the value of the stock; and (5) the plaintiff traded in the stock between the time the misrepresentations were made and the time the truth was revealed. *Bovee v. Coopers & Lybrand*, 216 F.R.D. 596, 603 (S.D.Ohio 2003) (citing *Freeman v. Laventhol & Horwath*, 915 F.2d 193, 197–98 (6th Cir.1990)).

The purpose of the fraud-on-the-market presumption is to establish a "causal connection between a defendant's misrepresentation and a plaintiff's injury." *Castillo v. Envoy Corp.* 206 F.R.D. 464, 470 (M.D.Tenn. 2002). This fraud-on-the-market presumption, however, can be rebutted, and competing movants argue that Defendants will be able to do so with regard to New Jersey. As explained by the court in *In re Safeguard Scientifics*, 216 F.R.D. 577, 582–83 (E.D.Pa. 2003), the reliance presumption can be rebutted by evidence that the plaintiff would have made the purchases regardless of the misstatement/omission. *Id.* At the class representative stage in *Safeguard*, Defendants rebutted the fraud-on-the-market presumption by demonstrating that the lead plaintiff increased his holdings in Safeguard stock even after public disclosure of the alleged fraud. Likewise, competing movants have argued that New Jersey began buying Cardinal at almost exactly the same time that Cardinal Health began to disclose publicly the ongoing investigations. The timing of New Jersey's purchases undermines any causal nexus between the Defendants' alleged misrepresentation and the resulting injury. It will be difficult to argue that the presumptive Lead Plaintiff incurred the vast bulk of its injury after Cardinal acknowledged that its accounting methodologies were under investigation. New Jersey's trading patterns will make it susceptible to claims that New Jersey did not rely on the Defendants' alleged misrepresentations when purchasing Cardinal stock. Thus, the Court finds the presumption of typicality and adequacy rebutted.

In eliminating New Jersey, the Court finds itself back to the newly modified Pension Fund Group, and concludes that PFG fulfills the criteria as set forth under the PSLRA. PFG has the largest claimed financial interest, it fulfills the typicality and adequacy requirements of Rule 23(a), and no competing movant has adequately rebutted these claims.

### 3. First New York

The Court notes that even if the Court had adopted First New York's proposed loss calculations, First New York would not be an

adequate lead plaintiff.[12] As a threshold consideration, it would be subject to unique defenses because it retained so few shares at the end of the Class Period. Even though it traded purchased over 7,000,000 shares, it retained only 87,999 shares at the end of the Class Period, leaving the amount of damage that First New York actually incurred an open question. A small amount of net shares is typically not favored when choosing a plaintiff under the four factor method. *See In re Network Assoc., Inc. Sec. Litig.*, 76 F.Supp.2d 1017, 1027 (N.D.Cal.1999) (explaining the net shares purchased is an important determinate of potential damage recovery); *see also Comdisco*, 2004 WL 905938, at *3 (explaining that net shares help identify the losses of any particular lead plaintiff). First New York, percentage-wise, retained the fewest number of its shares.

Second, competing movants argue that First New York may not be the most adequate plaintiff because of its complex corporate structure, its staff of 195 traders, and its status as a private investing firm, rather than a pension fund. At oral argument, competing movants speculated that Defendants would call First New York's 195 traders to the witness stand and spend days deposing First New York to ascertain the firm's corporate structure. While Counsel for First New York assured the Court that this outcome would not be likely, the Court notes that the putative class may not be best served by these additional complications.

Third, the Court notes the PSLRA prefers pension funds, which are aptly represented by the Pension Fund Group.

Accordingly, the Court finds First New York would be susceptible to unique defenses, and thus is not an adequate Lead Plaintiff.

#### 4. Wood Asset Management

Wood Asset Management will be subject to a unique defense regarding its standing to assert securities fraud claims on behalf of its clients because it has no proof that it is the clients' attorney-in-fact. Wood Asset Management argues that there is no requirement that it be attorney-in-fact for its clients, asserting that its status as a purchaser with investment authority is sufficient.

The Court notes that district courts are not in agreement about whether an investment advisor needs to be specifically appointed as attorney-in-fact. *Compare Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 255 (S.D.N.Y.2003) (appointing an investment advisor as lead plaintiff only after confirming its authority to act as attorney-in-fact), *with In re Rent–Way Sec. Litig.*, 218 F.R.D. 101, 106–109 (W.D.Pa.2003) (finding the specific language "attorney-in-fact" not necessary before an investment advisor can be appointed lead plaintiff). In light of this split of authority, the Court defers to the *Goodyear* decision which was decided by the Northern District of Ohio and finds that Wood Asset Management does not have standing. *In re Goodyear Tire & Rubber Co. Sec. Litig.*, No. 03–2166, slip op. at 9 (N.D.Ohio May 12, 2004) (finding the presumptive plaintiff adequate, in part, because it specifically had the authority to act as attorney-in-fact for its clients).

#### 5. The Engel Family Trust

The Engel Family Trust, which lost approximately $23,000, cannot claim the greatest loss under any loss calculation method. Hence, it would not be a viable representative.

### IV. CONCLUSION

The Court finds the Pension Fund Group, as segmented by the Court to include New Mexico SIC, Amalgamated Bank, PACE, and California Ironworkers, is the best candidate for Lead Plaintiff status. PFG has the second most significant loss at $11 million and satisfies the adequacy and typicality requirements under Rule 23(a). Accordingly, PFG is accorded Lead Plaintiff status.

In accordance with this Order, the Court hereby **ORDERS** has follows:

---

12. The parties focused heavily on whether First New York's trading style impacted its adequacy as lead plaintiff. The Court holds no opinion on this heavily debated issue, noting only that precedent exists for both arguments.

312

- **GRANTS** the Pension Fund Group's Motion for Appointment as Lead Plaintiff and Its Selection of Lead Counsel to Consolidate Related Actions [Docket No. 36];

- **DENIES** the State of New Jersey's Motion for Appointment as Proposed Lead Plaintiff and For Approval of Selection of Counsel [Docket No. 23];

- **DENIES** First New York LLC's Motion for Appointment as Lead Plaintiff and Approval of Its Selection of Co–Lead and Liaison Counsel [Docket No. 31];

- **DENIES** Wood Asset Management's Motion to Appoint Counsel Gold Bennett Cera & Sidener LLP as Lead Counsel and Wood Asset Management, Inc. as Lead Plaintiff [Docket No. 17]; and

- **DENIES** the Engel Family Trust's Motion for an Order to Appoint The Engel Family Trust Lead Plaintiff and Approval of Lead Counsel [Docket No. 30].

**IT IS SO ORDERED.**