**In re McKESSON HBOC, INC. SECURITIES LITIGATION**

**And Related Cases**

**No. C–99–20743–RMW.**

United States District Court, N.D. California.

Dec. 22, 1999.

James M. Finberg, Lieff, Cabraser, Heimann & Bernstein LLP, San Francisco, CA, Neil L. Selinger, Lowey, Dannenberg, Bemporad & Selinger, P.C., White Plains, NY, for New York City Pension Funds.

Leonard Barrack, Barrack, Rodos & Bacine, Philadelphia, PA, Stephen R. Basser, San Diego, CA, Max W. Berger, Bernstein Litowitz Berger & Grossmann LLP, New York, NY, for New York State Common Retirement Fund.

James E. Lyons, Skadden, Arps, Slate, Meagher & Flom LLP, San Francisco, CA, for Defendant McKesson HBOC, Inc.

Ronald S. Kravitz, Zelle, Hofmann, Voelbel & Gette LLP, San Francisco, CA, for Plaintiff in Chang.

Robert S. Green, Girard & Green LLP, San Francisco, CA, for Plaintiff in Cohen.

Lawrence A. Callaghan, Severson & Werson, San Francisco, CA, for Plaintiff in Jacobs.

Moses Silverman, Paul, Weiss, Rifkind, Wharton & Garrison, New York, NY, for Defendants in Cohen.

## ORDER

WHYTE, District Judge.

(1) APPOINTING NEW YORK STATE COMMON RETIREMENT FUND AS LEAD PLAINTIFF AND APPROVING SELECTION OF LEAD COUNSEL;

(2) CONSOLIDATING JACOBS; AND

(3) SETTING A HEARING AND BRIEFING SCHEDULE REGARDING POSSIBLE CONSOLIDATION OF THE COHEN AND CHANG ACTIONS

Before the court are two competing motions for lead plaintiff in these consolidated securities class actions. Having considered the initial moving and responding papers, a joint submission on financial interest in the litigation, and the argument of counsel at two hearings devoted to this question, the court now appoints the New York State Common Retirement Fund as lead plaintiff, and confirms its selection of lead counsel.

## I. BACKGROUND

These consolidated class actions arise from alleged financial irregularities that occurred at HBO & Company (HBOC), a predecessor corporation to defendant McKesson HBOC, Inc. HBOC had improperly characterized approximately forty million dollars in contingent transactions as sales in financial reports in 1998. HBOC then merged with McKesson to form McKesson HBOC in January 1999. In April 1999, the improper accounting practices allowed by HBOC were acknowledged in a press release. The price of McKesson HBOC stock immediately dropped by approximately 50%. A flurry of complaints was filed by numerous plaintiff's securities firms on behalf of their

respective clients who owned shares in one or more of the involved companies.

On October 29, 1999, the court held a hearing on the consolidation of 53 securities class actions against defendant McKesson HBOC, Inc. At the hearing, the court also heard from several competing movants for the position of lead plaintiff in this matter.

On November 2, 1999, the court issued an order consolidating all but one of the related class actions. The court also held that the single investor with the greatest financial interest in the litigation should be appointed lead plaintiff.[1] In so holding, the court rejected attempts to recognize amorphous plaintiff "groups" that had no meaningful, non-litigation-related identity.

The court also rejected the motion of the Florida State Bar of Administration (Florida) to assume lead plaintiff status. Although a single investor with the largest claimed loss, Florida had recently served as lead plaintiff in more than five securities class actions, thus exceeding the presumptive statutory cap on securities class actions filed within a three-year period.

Because the briefing by the various lead plaintiff movants was focused on "groups" rather than on individual candidates, and because claimed losses were stated largely in conclusory and conflicting terms, the court declined to appoint a lead plaintiff without further information. The court ordered the two foremost competitors for lead plaintiff status, the New York City Pension Funds (N.Y.C) and the New York State Common Retirement Fund (N.Y.S) to exchange trading data and file a joint submission detailing: 1) number of shares purchased during the class period; 2) net shares purchased during the class period; 3) net funds expended during the class period; and 4) approximate losses from the alleged fraud. *See In re Olsten Corporation Securities Litigation*, 3 F.Supp.2d 286, 295 (E.D.N.Y.1998) (suggesting this four-factor analysis). The parties were directed to explain methodological disagreements, and were invited to select a neutral export in accounting to assist them in the process.

The parties filed their joint submission on November 19, 1999. There was no indication in the joint submission that the parties employed the services of a neutral expert. Nor was there much indication that this was a "joint" submission. After a two-paragraph joint introduction (stating that the parties disagreed on the application of each of the four factors), the movants provided separate 10–page discussions: "NYC's Position" and "The New York State Common Retirement Fund's Position With Respect to the Appropriate Application of the Four *Olsten* Factors." The methodologies conflicted irreconcilably (for instance, on the meaning of the word "net"), and the numbers generated by these methodologies obviously conflicted as well. NYC and NYS each continued to claim the greatest financial stake in the litigation.

Nevertheless, the joint submission assisted the court in clarifying the issues. The movants largely succeeded in succinctly characterizing the disagreements that separated them. Moreover, the movants were apparently fully forthcoming in exchanging data, and there are no disagreements over the raw data, just over their proper interpretation. The parties also agreed on the appropriate class periods for various transactions.

Although the joint submission clarified most of the methodological disagreements between the movants, the court decided to hold one further hearing, so that NYC and NYS would have an opportunity to "walk through" their analyses and present a line-by-line assessment of their relative finan-

---

1. Subsequent to the court's order, two other complaints have come to the court's attention: *Chang*, No. C–99–05075–CAL (which the court has related to these actions, but which court has not yet received a new docket number), and *Jacobs*, No. C–99–21192–RMW (which this court has already related to these actions).

cial interests in this litigation. This hearing was held on December 14, 1999.

## II. ANALYSIS

The court finds determination of who "has the largest financial interest in the relief sought by the class" difficult at this early stage of the litigation, given the complexity of this case. 15 U.S.C. §§ 78u–4(a)(3)(B)(iii)(I). However, the Reform Act plainly requires speedy consideration of the lead plaintiff question so as not to delay further proceedings. (For instance, in this case, the consolidation of a related shareholder's derivative action and the filing of an amended consolidated complaint have been delayed pending resolution of the lead plaintiff motions.) There is therefore a need for both speed and reasonable accuracy.

The court is also aware that arguments over relative financial losses put plaintiffs' counsel in an awkward position, because inevitably, arguments will be made regarding certain damages measures that might later be used against class members with certain types of claims. Before turning to an analysis of the movants' loss claims, then, the court notes that this discussion is limited to the resolution of the lead plaintiff motions, not to ultimate questions of liability or damages.

## A. THE FIRST THREE FACTORS

■ With regard to the first factor, one might guess that the total number of shares purchased (or acquired through exchange) would be a point of little dispute. However, the parties have two major disagreements. First, the NYC analysis properly avoids double-counting of HBOC shares. There are class claims involving (1) the purchase of HBOC shares on the open market, (2) the acquisition of McKes-

son HBOC stock in exchange for HBOC stock, and (3) the acquisition of HBOC stock in exchange for Access Health stock. As NYC notes, a plaintiff can only recover once for each fraud-affected share. Thus, NYC correctly argues, it makes no sense to double-count such shares. Second, the court sees no need to provide "totals" that add up shares of stock in different companies, because the shares traded at different prices (both absolutely and relatively) during the class period. (On the other hand, the number of McKesson shares voted during the merger is *not* germane to the inquiry about the number of shares purchased/acquired during the class period. The method for counting such shares is relevant to damages, however, and is discussed below.)

Ultimately, however, this factor provides little insight, precisely because of the many different securities and transactions involved in this litigation. Both movants held millions of shares of the affected securities and participated in various transactions, but no clear picture emerges. For this reason, the net shares inquiry is similarly unrevealing.

The net funds inquiry is somewhat more helpful. Looking at total cash outlays on affected stock during the class period, minus cash receipts during the same period,[2] New York State spent a net total of $15,066,015 during the class period, while New York City actually had net *receipts* of $681,298 for the class period. While the court believes that by far the most important inquiry is possible damages recovery (as discussed below), these figures are telling. A net purchaser will, presumably, have a greater interest in the litigation, because he or she was induced by the fraud to purchase shares,[3] and has been

---

**2.** This is the method advocated by NYS. NYC advocates a more complex method, whereby cash receipts are netted against pre-class purchases until such purchases are exhausted, at which point receipts are than netted against class period purchases. The court favors the approach suggested by NYS, because the NYC

approach can mask significant class period receipts if there were extensive pre-class period holdings.

**3.** Of course, one can be induced by fraud to hold onto shares, thereby foregoing an opportunity to invest in other more lucrative (or at

left "holding the bag" when the fraudulent inflation is revealed. By contrast a net seller has arguably *profited* more from the fraud than it has been injured, possibly reducing its incentive to litigate. While such profits may not bar recovery, they are one relevant factor in identifying the plaintiff with the greatest financial interest in the litigation.

## B. FACTOR FOUR: APPROXIMATE LOSSES SUFFERED

The parties have several disagreements over the fourth and final factor: an approximation of losses incurred. While the disputes obviously reflect the movants' interest in accumulating the largest dollar amount of estimated losses, they also reveal philosophical differences over the meaning of the Reform Act's "greatest financial interest" language.

The statute does not define what the "greatest financial interest" is, nor does the legislative history elaborate on the term. (When discussing this language, the Congressional drafters focused on their desire to have institutional investors take charge of securities litigation, rather than on how to determine the "greatest financial interest" when dealing with more than one large institution.) New York City notes that the statute does not use the word "damages" to refer to this determination, and suggests that a more pragmatic focus on actual economic losses is required. New York City also notes that the *Olsten* court referred to "losses" and not damages. New York State disagrees, arguing that the relevant inquiry is simply what damages a potential lead plaintiff is entitled to assert.

The court is inclined to agree with New York State. One's "interest" in a litigation is rather directly tied to what one might recover. Indeed, the dictionary confirms that one's "interest" is a forward-looking measure of what one hopes to gain: "right, title, or *legal share* in something <what exactly is your ~ in this affair>: *participation in advantage,* profit and responsibility ... STAKE, CLAIM ... something that is the *object of desire* <natural ~ in seeing his children well educated>." *Webster's Third New International Dictionary* 1178 (1981) (emphases added).[4]

In this case, however, it is not necessary to decide this issue, because, using either pure legal damages analysis or more of a loss-based approach, New York State appears to have the greater financial interest in the outcome of this litigation.

### 1. Class–Period Sales

■ For its claims under Sections 10(b) and 14(a), NYC counts shares that were sold or exchanged during the class period, that is, prior to the McKesson press release. NYS asserts that such shares were sold into a fraud-inflated market, and that they were therefore not damaged.

Citing *Wool v. Tandem Computers, Inc.,* 818 F.2d 1433, 1436–37 (9th Cir.1987), NYC counters that the fraud premium in this case may have fluctuated, and that even "in-and-out" traders may have had losses. NYC gives two possible scenarios: partial disclosures may have begun seeping into the pool of information available to investors, or unspecified market forces may have interacted with the fraudulently misstated information, causing the fraud premium to vary over time.

While NYC's analysis may ultimately turn out to be correct, the court believes a more basic approach is required for determination of lead plaintiff. Demonstrating the existence of either scenario suggested by NYC, let alone the effect of such sce-

least more honest) investments. However, it stands to reason that the fraudulent misrepresentations have had more of an effect on new purchasers during the fraud period than those with pre-class period holdings, if only due to inertia.

4. The etymology of the word "interest" is even more suggestive. According to the editors of Webster's Third, one of the sources of the modern English word is the Middle French word *interest,* which meant "damage, loss, compensation for damage."

narios on damages, is not feasible at this early stage of the litigation. While *Wool* allowed an "in-and-out" plaintiff to escape summary judgment based on an alleged lack of damages, the plaintiff was still required to prove his damages to recover. Such proof at this juncture would unduly delay these proceedings.

In any event, NYC has put forth little evidence that there was a varying fraud premium—certainly not enough to suggest that the court should require formal damages studies before appointing lead plaintiff. While NYC points to the falling price of McKesson HBOC stock in the weeks before the April press release, there is no suggestion of specific market forces interacting with the allegedly fraudulent information to vary the fraud premium.

There is also little evidence of partial corrective disclosures reaching investors. The *Business Week* article cited by NYC (which was written well after the April collapse in McKesson's trading price) suggests that an August 1998 analyst's report should have alerted the investment community to problems with HBO & Co. accounting practices. *See* Janet Rae–Dupree, *Anatomy of a Shareholder Slaughter*, Bus. Wk., May 17, 1999, at 44, *available in* 1999 WL 8227445. However, there is no indication that the August report made any impact on the market, and the *Business Week* article notes that other analysts vigorously criticized the report, which would have minimized its "corrective" value.[5] Thus, the court finds that, even if it were appropriate to consider the *Business Week* article as evidence, it would not affect the court's decision to assume a constant fraud premium.

The court therefore holds that it is inappropriate to count losses (or profits) by "in-and-out" traders in this case when determining the plaintiff with the greatest financial interest in the litigation.

### 2. Appropriate Treatment of HBOC Shares

■ Even accepting NYS's analysis of "in and out" sales, the parties still have conflicting claims to having the greater loss.

The key question then, is the appropriate treatment of shares held in HBOC, the predecessor company where the alleged fraud took place.

Before turning to the movants' arguments on the question, the court confesses a certain degree of unease with the notion that holders of HBOC stock are entitled to damages. In particular, HBOC shareholders who purchased before the alleged fraud took place appear to have suffered no real economic loss.[6] Their shares were inflated due to fraud after they had purchased them, and they acquired McKesson HBOC at a discount because of that fraud. In so doing, they also infected McKesson shareholders with the fraud that previously affected only themselves. (Although, it is true, they did this through no apparent fault of their own.) The April press release only took away the undeserved fraud

---

**5.** The court notes that the August report certainly did not inspire any of plaintiffs' counsel to initiate securities class action law suits, while the April press release—and the attendant drop in McKesson HBOC's share price— sparked the filing of more than fifty complaints. As the author of the *Business Week* article writes: "Now, however, the analysts who smiled upon the HBOC deal are second-guessing the purchase. This kind of vigilance would have helped beforehand. Unfortunately for investors, it's a little late."

**6.** As both sides noted at argument, there is one possible way in which HBOC shares acquired before the class period may have sustained a loss as a result of the alleged fraud. Given the large drop in McKesson HBOC's trading price, which dwarfed the relatively inconsequential dollar amounts involved in the alleged fraud (approximately $40 million in misstated sales for a $2.1 billion concern), the market arguably did more than subtract the fraud premium—it may also have exacted a "fraud penalty" for lost investor confidence. This "fraud penalty" may in some way be a compensable loss even if there is no "fraud premium" to account for.

premium. Moreover, because their shares were now part of a merged entity, the fraud penalty exacted by the market was probably less than it would have been if HBOC had still been a separate entity. For this reason, even HBOC shareholders who bought shares after the alleged fraud can be said to have suffered much less than their McKesson counterparts who bought shares before the merger went through. At worst, the allegedly false registration statements may have lulled some HBOC shareholders into holding their stock instead of cashing in on the fraud inflation. This hardly seems like a sympathetic case for damages.

This said, there is another view. The literal terms of Section 11 appear to create a remedy for all shareholders who purchase stock pursuant to a false registration statement, regardless of actual loss. There may be a windfall, but allowing such a windfall may be seen as effecting Congress's intent to penalize severely those who issue securities under false registration statements. And, while the defendants may eventually argue that Section 11 does not even apply to HBOC shares under the circumstances here, both movants agree that they would vigorously assert Section 11 claims for the class—at least on behalf of class members with pre-class period HBOC holdings, who would otherwise appear to be without any claim at all. Thus, the court will assume (for the purposes of this motion only, of course), that Section 11 remedies are available to at least some class members who held HBOC stock. At the very least—and perhaps, as NYS suggests, this is really all that the

court need decide for purposes of this motion—a responsible plaintiff's attorney would assert a Section 11 claim for all HBOC shares, even if the claim may ultimately fail.

NYC, recognizing the speculative nature of the Section 11 claim, attempts to calculate damages for claims on any basis *other* than Section 11. For instance, class period purchases of HBOC are treated as Section 10(b) claims.[7] However, NYC still faces problems with the large numbers of HBOC shares purchased before the class period. Ultimately, NYC assigns those shares the Section 11 measure of damages.

The court finds this analysis untenable. Section 11 damages, if computed from the date of the McKesson–HBOC merger are more than $50 per share and thus much greater on a per-share basis than other damages measures. If Section 11 is indeed the most tenuous claim that plaintiffs have, it seems unreasonable to assign them the highest per-share value. For purposes of this motion, the only feasible method for handling Section 11 claims is to assign all potential Section 11 shares the same value, or to assign them no value at all.[8] (If, as NYC argues, the damages inquiry should be centered around actual losses, the latter course would seem preferable.)

This decides the motion, because recognizing viable claims for all class-period HBOC transactions (combined with disregard for any "in-and-out" transactions) is precisely the analysis propounded by NYS. If, on the other hand, the HBOC Section 11 damages are eliminated, then even under NYC's own calculations, it has $3 million less in damages than NYS.[9] Given the

---

7. Treating such shares as Section 10(b) shares raises problems of its own. If the merger is *viewed as effecting a sale* of all HBOC shares, than all HBOC shares were sold into an inflated market, and are thus ineligible to recover under Section 10(b). Even if the merger is not viewed as a sale, there is still the difficulty of calculating damages when one security is bought, but a different security is sold.

8. One could hypothesize a third course, by which Section 11 claims would be discounted

based on their relative improbability of success. Requiring the parties to engage in such an analysis would unduly protract these proceedings, and it is not clear how (given the dearth of case law on the subject of damages in securities cases) one would calculate this "discount."

9. NYC's own numbers show their own total damages as $67,518,027, and NYS's damages as $54,722,088. Of those amounts, however, $31,505,823.00 of NYC's damages, and only

large dollar amounts involved, this is a close margin, but the margin holds under both calculations.

Accordingly, the court determines that NYS has shown a greater financial interest in the outcome of the litigation. And, as noted before, the court believes that NYS has selected experienced lead counsel who will vigorously assert the interests of the class.[10] Thus, the court will not disturb NYS's selection of lead counsel.

## IV. ORDER

For the foregoing reasons, the court orders as follows:

1) The court appoints the New York State Common Retirement Fund as lead plaintiff.

2) The court approves the selection of the law firms of Barrack, Rodos & Bacine and Bernstein Litowitz Berger & Grossmann LLP to serve as lead counsel.

3) The court will hold a hearing with regard to the possible consolidation of the *Cohen* shareholders' derivative suit and the *Chang* ERISA claims at 9:00 a.m. on January 28, 1999. Cohen and Chang are each directed to file a memorandum of points and authorities of no more than 15 pages setting forth why each one's suit should not be consolidated. Cohen's and Chang's memoranda shall be filed on or before January 7, 1999. Both lead plaintiff and defendants in all these cases may file responsive papers of no more than 10 pages each on or before January 14, 1999. Reply papers, if any, shall not exceed 5 pages and must be filed on or before January 21, 1999.

4) Civil Actions 99–21192–RMW (*Jacobs*) is hereby consolidated with the related consolidated actions. If the *Jacobs* plaintiffs object to consolidation, they must file motions to sever their actions, to be noticed and briefed on the same schedule as the *Cohen* and *Chang* motions.

5) New York State shall file a consolidated complaint by January 21, 1999. The consolidated complaint should not include any shareholders' derivative or ERISA claims. If the *Cohen* and/or *Chang* actions are ultimately consolidated, the court will, of course, grant leave to amend the consolidated complaint to include such claims. The consolidated complaint shall be the operative pleading in the consolidated actions, and it shall supersede all previously filed complaints.

6) Lead plaintiff and defendants in the consolidated actions shall meet and confer to prepare a proposed order implementing the consolidation of these cases, including procedures for service of court papers. The parties shall file their proposed order with the court no later than January 21, 1999.

7) New York State is directed to serve this order on all counsel not indicated on the courts' service list.

---

$15,650,528 of NYS's damages, are for Section 11 HBOC shares purchased before the beginning of the class period. After subtracting those Section 11 HBOC numbers, NYC only has damages of $36,012,204, while NYS's damages are $39,121,560. (The actual difference is greater, because NYC's calculations of in-and-out damages and adjustments for post-merger profits inflated NYC's "lead" over NYS.)

**10.** At the hearing, NYC and NYS both addressed the issue of attorney's fees. The court notes that any fee agreement that NYS has reached with its counsel may set an *upper* limit on attorney's fees, but that ultimately, attorney's fees will be subject to the approval of the court, should there be a settlement or resolution on the merits.