**Robbie BENSLEY, Individually and on Behalf of all Others Similarly Situated, Plaintiffs,**

v.

**FALCONSTOR SOFTWARE, INC., et al., Defendants.**

**No. 10 CV 4572 (ERK).**

United States District Court, E.D. New York.

Aug. 29, 2011.

---

Samuel H. Rudman, Robbins Geller Rudman & Dowd, LLP, Melville, NY, for Plaintiffs.

Phillip Kim, Rosen Law Firm, P.A., New York, NY, for William Burns.

Daniel J. Kramer, James L. Brochin, Ankush Khardori, Paul, Weiss Rifkind, Wharton & Garrison LLP, Daniel Slifkin, Craveth, Swaine & Moore LLP, New York, NY, for Defendants.

### MEMORANDUM AND ORDER

CHERYL L. POLLAK, United States Magistrate Judge.

On October 1, 2010, a securities class action was commenced against defendant FalconStor Software, Inc. ("FalconStor" or the "Company"), and certain of its present and former officers and directors, alleging violations of Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, as amended by the Private Securities Litigation Reform Act of 1995 ("PSLRA"), 15 U.S.C. §§ 78j(b) and 78t, and Rule 10b–5 promulgated thereunder, 17 C.F.R. § 240.10b–5. This action, which was consolidated with a related action filed in this Court on October 7, 2010, seeks damages on behalf of all persons who purchased or otherwise acquired FalconStor common stock (the "Class") between February 5, 2009 and September 29, 2010, inclusive (the "Class Period").

Presently pending before this Court are cross-motions filed by the Rochester Laborers Pension Fund (the "Fund") and William Burns ("Burns") for appointment as lead plaintiff and for approval of Class counsel.[1] For the reasons set forth below, the Court appoints William Burns as lead plaintiff and the Rosen Law Firm as Class counsel.

### FACTUAL BACKGROUND

According to the Complaint, FalconStor develops, manufactures, and distributes network storage solutions, along with providing related maintenance, engineering, and implementation services. (Compl.[2] ¶ 7). The Complaint alleges that during the Class Period, FalconStor issued materially false and misleading statements about the Company's financial condition, including a failure to disclose that FalconStor was experiencing a weak demand for its products and services, and that the Company was making improper payments to secure a contract from a customer. (Id. ¶ 41). As a result, plaintiffs allege that defendants lacked a reasonable basis for the positive statements regarding the Company's prospects that were issued during the Class Period. (Id.)

On September 29, 2010, the Chairman, Chief Executive Officer, and President of FalconStor, ReiJane Hui, resigned from the Company. (Id. ¶ 37). The press release an-

---

1. On June 8, 2011, the Court requested clarification on a number of issues, including the impact of the June 6, 2011 Supreme Court decision in *Erica P. John Fund, Inc. v. Halliburton Co.,* —— U.S. ——, 131 S.Ct. 2179, 180 L.Ed.2d 24 (2011), on the pending motions for appointment as lead plaintiff. After receiving additional submissions from both parties, the Court held an oral argument on the cross-motions on June 29, 2011.

2. Citations to "Compl." refer to the Complaint filed in *Bensley v. FalconStor Software, Inc.,* No. 10 CV 4572 (the "*Bensley* action").

nouncing Hui's resignation revealed that he "tendered his resignation following his disclosure that certain improper payments were allegedly made in connection with the Company's contract with one customer." (*Id.*) As a result of this revelation and Mr. Hui's resignation, the price of the Company's stock fell 22%, by $0.91 per share, closing at $3.15 per share after unusually heavy trading. (*Id.* ¶ 38).

In addition to the initial Complaint filed in the *Bensley* action, plaintiff Bensley published a notice in *Business Wire* on October 1, 2010, announcing the pendency of the class action (the "Notice"). (Rosenfeld Decl.,[3] Ex. A). Under the PSLRA, which establishes the procedure for appointing the lead plaintiff in Securities Exchange Act cases, 15 U.S.C. § 78u–4(a)(1) and (a)(3)(B)(i), members of the proposed class who wish to be appointed as lead counsel have 60 days following the publication of the first notice to apply to the Court for appointment, regardless of whether they have previously filed a complaint in the action. 15 U.S.C. § 78u–4(a)(3)(A) and (B).

Pursuant to the Notice, the Fund filed a timely motion to be appointed as lead plaintiff, alleging that the Fund had incurred a substantial loss in the amount of $43,255.00, as a consequence of the false and misleading statements of defendants. (Fund Mot.;[4] Rosenfeld Decl. ¶ 3, Ex. B).

Mr. Burns, who commenced a separate action[5] on October 8, 2010, has filed a competing motion for appointment as lead plaintiff. Mr. Burns claims losses of $15,150.00, and argues that because the Fund sold all of its shares prior to the September 29, 2010 disclosure of fraud, the Fund is a complete

"in and out" trader and has suffered no compensable damages. Burns, on the other hand, did not sell his shares during the Class Period and is therefore, he asserts, better qualified to serve as lead plaintiff. (Kim Decl.,[6] Ex. 3; Burns Opp.[7] at 2). The Court agrees.

## DISCUSSION

### A. Standards for Appointing a Lead Plaintiff

 The PSLRA sets forth certain parameters for the Court to use in determining which member or members of the class would be most capable of representing the class as lead plaintiff. *See* 15 U.S.C. § 78u–4(a)(3)(B). Specifically, the PSLRA provides:

[T]he court shall adopt a presumption that the most adequate plaintiff in any private action arising under this Act is the person or persons that—

(aa) has either filed a complaint or made a motion in response to a notice . . . ;

(bb) in the determination of the court, has the largest financial interest in the relief sought by the class; and

(cc) otherwise satisfies the requirements of Rule 23 of the Federal Rules of Civil Procedure.

15 U.S.C. § 78u–4(a)(3)(B)(iii)(I). As the Second Circuit explained in *Hevesi v. Citigroup, Inc.*, "[t]wo objective factors inform the district court's appointment decision: the plaintiffs' respective financial stakes in the relief sought by the class, and their ability to satisfy the requirements of Rule 23." 366 F.3d 70, 81 (2d Cir.2004); *see also Baugh-*

---

**3.** Citations to "Rosenfeld Decl." refer to the Declaration of David A. Rosenfeld in Support of the Motion of Rochester Laborers Pension Fund for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, dated November 30, 2010.

**4.** Citations to "Fund Mot." refer to the Notice of Motion of Rochester Laborers Pension Fund for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, filed on November 30, 2010.

**5.** The *Bensley* action was commenced on October 1, 2010; Mr. Burns filed his case on October 8,

2010, *Black v. FalconStor Software, Inc.*, 10 CV 4632. The actions were consolidated on November 4, 2010.

**6.** Citations to "Kim Decl." refer to the Declaration of Phillip Kim in Support of Motion of William Burns for Appointment as Lead Plaintiff and Approval of Lead Plaintiffs Selection of Counsel, filed on November 30, 2010.

**7.** Citations to "Burns Opp." refer to Plaintiff Burns' Memorandum of Law in Opposition to Competing Lead Plaintiff Motion, dated December 14, 2010.

man v. Pall Corp., 250 F.R.D. 121, 125 (E.D.N.Y.2008); *Martingano v. Am. Int'l Group, Inc.*, No. 06 CV 1625, 2006 WL 1912724, at *3–4 (E.D.N.Y. July 11, 2006). Under the PSLRA, the Court must start with the rebuttable presumption that the most adequate plaintiff is the person or entity with the largest financial interest in the relief sought. *See In re Fuwei Films Sec. Litig.*, 247 F.R.D. 432, 436 (S.D.N.Y.2008) (noting that "there is a rebuttable presumption that a 'person or group of persons' . . . is the most adequate plaintiff, provided that . . . [they have] 'the largest financial interest in the relief sought by the class'"); *see also Levine v. AtriCure, Inc.*, 508 F.Supp.2d 268, 276–77 (S.D.N.Y.2007) (citing 15 U.S.C. § 77z–1(a)(3)(B)). To rebut this presumption, the opposing movant must show that the plaintiff is not adequate or typical of the class, *see In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. 298, 302 (S.D.Ohio 2005), or more specifically, is "subject to unique defenses" that render that plaintiff an inadequate class representative. 15 U.S.C. § 78u–4(a)(3)(B)(iii)(II); *see In re Fuwei Films Sec. Litig.*, 247 F.R.D. at 436.

Although the PSLRA does not specify how to determine which plaintiff has "'the largest financial interest'" in the relief sought, the most significant factor appears to be financial loss.[8] *In re Fuwei Films Sec. Litig.*, 247 F.R.D. at 436–37 (quoting *Kaplan v. Gelfond*, 240 F.R.D. 88, 93 (S.D.N.Y.2007)). In the absence of an explicit test, some courts in this Circuit have adopted a four factor test, known as the *Olsten–Lax*[9] test, in which the court considers: "(1) the number of shares purchased during the class period; (2) the number of net shares purchased during the class period; (3) the total net funds expended during the class period; and (4) the approximate losses suffered." *In re Fuwei Films*

Sec. Litig., 247 F.R.D. at 437 (citations omitted); *see also In re Comverse Tech., Inc. Sec. Litig.*, No. 06 CV 1825, 2007 WL 680779, at *3 (E.D.N.Y. Mar. 2, 2007); *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.*, 229 F.R.D. 395, 402 (S.D.N.Y.2004) (collecting cases). Most courts, however, emphasize the fourth factor the "'approximate loss suffered.'" *In re Fuwei Films Sec. Litig.*, 247 F.R.D. at 437 (quoting *Kaplan v. Gelfond*, 240 F.R.D. at 93); *see also In re Comverse Tech., Inc. Sec. Litig.*, 2007 WL 680779, at *3; *Richardson v. TVIA, Inc.*, No. 06 CV 6304, 2007 WL 1129344, at *4 (N.D.Cal. Apr. 16, 2007) (noting that of the *Olsten–Lax* factors, approximate loss is the "most determinative"); *In re Bally Total Fitness Sec. Litig.*, Nos. 04 C 3530, 04 C 3634, 04 C 3713, 04 C 3783, 04 C 3844, 04 C 3936, 04 C 4342, 04 C 4697, 2005 WL 627960, at *4 (N.D.Ill. Mar. 15, 2005) (holding that the "best yardstick by which to judge 'largest financial interest' is the amount of loss, period").

■ The third criteria required by the PSLRA in evaluating the appropriateness of a proposed class representative requires that the moving plaintiff establish "a prima facie case of typicality and adequacy" under the traditional requirements of Rule 23 of the Federal Rules of Civil Procedure. *In re Cendant Corp. Litig.*, 264 F.3d 201, 263–65 (3d Cir.2001); *In re Fuwei Films Sec. Litig.*, 247 F.R.D. at 436; Fed.R.Civ.P. 23. Rule 23 provides that a party seeking to serve as class representative must satisfy four requirements:

1) the class is so numerous that joinder of all members is impracticable;

2) there are questions of law or fact common to the class;

---

**8.** As the Eighth Circuit noted in *Green v. Ameritrade, Inc.*, the PSLRA was enacted to "curb abuse in securities suits, particularly shareholder derivative suits in which the only goal was a windfall of attorney's fees, with no real desire to assist the corporation on whose behalf the suit was brought." 279 F.3d 590, 595 (8th Cir.2002). The provision in the PSLRA requiring the court to appoint the shareholder with the largest financial interest was enacted in order "to avoid situations in which a named class representative has a minimal financial stake in the case and acts

primarily as a tool of the lawyers who may well have recruited him." *Sakhrani v. Brightpoint, Inc.*, 78 F.Supp.2d 845, 850 (S.D.Ind.1999).

**9.** The *Olsten–Lax* factors are derived from the two court decisions in *In re Olsten Corporation Securities Litigation*, 3 F.Supp.2d 286, 295 (E.D.N.Y.1998), and *Lax v. First Merchants Acceptance Corporation*, No. 97 CV 2715, 1997 WL 461036, at *5 (N.D.Ill. Aug. 11, 1997).

3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and

4) the representative parties will fairly and adequately protect the interests of the class.

Fed.R.Civ.P. 23. " '[O]f the four prerequisites to class certification, only two—typicality and adequacy—directly address the personal characteristics of the class representative.' " *In re Fuwei Films Sec. Litig.,* 247 F.R.D. at 436 (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.,* 229 F.R.D. at 412); *see also In re Oxford Health Plans, Inc. Sec. Litig.,* 182 F.R.D. 42, 49 (S.D.N.Y.1998). The moving party need only make a preliminary showing that it satisfies these requirements. *In re Fuwei Films Sec. Litig.,* 247 F.R.D. at 436, 439.

■ In determining adequacy of representation, the court considers whether "(1) class counsel is qualified, experienced, and generally able to conduct the litigation" and whether "(2) class members do not have interests that are antagonistic to one another." *Babcock v. Computer Assocs. Intern., Inc.,* 212 F.R.D. 126, 131 (E.D.N.Y.2003) (quoting *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d 285, 291 (2d Cir.1992)); *see also In re Fuwei Films Sec. Litig.,* 247 F.R.D. at 436 (stating: " '(1) there should be no conflict between the interests of the class and the named plaintiff nor should there be collusion among the litigants; and (2) the parties' attorney must be qualified, experienced, and generally able to conduct the proposed litigation.' " (quoting *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.,* 229 F.R.D. at 412–13)).

■ In determining whether the lead plaintiff's claims are typical of those of the class, the court must first determine if "each class member's claim arises from the same course of events, and each class member

makes similar legal arguments to prove the defendant's liability." *In re Drexel Burnham Lambert Group, Inc.,* 960 F.2d at 291. While the lead plaintiff's claims need not be "identical" to the claims of the other members of the class, " 'similarity of legal theory may control.' " *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust v. LaBranche & Co., Inc.,* 229 F.R.D. at 412 (quoting *In re Prudential Sec., Inc. Ltd. P'ships Litig.,* 163 F.R.D. 200, 208 (S.D.N.Y.1995)).

B. *Lead Plaintiff Analysis*

■ In this case, there are two competing parties seeking appointment as Class representative. Both the Fund and Mr. Burns have filed lawsuits against FalconStor and have certified that they are willing to serve as the lead plaintiff for this consolidated action. (Fund Mot.; Burns Mot.[10]).

Both parties also claim to have the largest financial interest in the relief sought by the Class. The Fund alleges that it purchased FalconStor common stock during the Class Period in reliance on materially false and misleading statements, incurring a loss of $43,255.00.[11] (Rosenfeld Decl., Ex. B). In calculating its losses, the Fund explains that it purchased 20,000 shares of FalconStor stock on September 28, 2009 at a price of $4.68 per share (or a cost of $93,656). (Fund Resp.[12] at 2). Subsequently, it purchased an additional 10,000 shares at a price of $3.99 per share (or a cost of $39,895). (*Id.*) The Fund's combined out-of-pocket investment in FalconStor stock was therefore $133,551. (*Id.*) "After a negative disclosure by the Company on January 14, 2010 caused substantial decline in the price of FalconStor stock," the stock was sold. (*Id.*) Specifically, the Fund sold all 30,000 shares in three sales in May 2010: 10,000 shares on May 4, 2010 at $2.99 per share (for proceeds of $29,939); 10,000 shares on May 6, 2010 at $3.02 per share (for proceeds of $30,201); and 10,000

10. Citations to "Burns Mot." refer to the Notice of Motion of William Burns for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Counsel, filed on November 30, 2010.

11. In its June 8, 2011 Order, the Court Ordered the Fund to provided a more detailed explana-

tion as to how it calculated its alleged losses in this case.

12. Citations to "Fund Resp." refer to the Response of Rochester Laborers Pension Fund to the Court's June 8, 2011 Order, filed on June 21, 2011.

shares on May 6, 2010 at $3.02 per share (for proceeds of $30,156) for total proceeds of $90,296.[13] The Fund calculated its losses "by subtracting the total value of the proceeds that it received after it sold its shares of FalconStor ... stock—following a negative disclosure by the Company that caused the stock price to decline 18% in a single day— from the total amount of its out-of-pocket investment in FalconStor stock." (*Id.*) By subtracting the total sale proceeds of $90,296 from the total purchase price of $133,551, the Fund calculated a total loss of $43,255. (*Id.* at 2–3).

Mr. Burns, on the other hand, claims that he has the largest financial interest. He asserts that because the Fund was a complete in and out trader, it suffered no loss and therefore has no financial interest at all. (Kim Dec., Ex. 3; Burns Opp. at 2). Burns purchased 15,000 shares of FalconStor common stock at a total cost of $58,350, and unlike the Fund, he still held those shares at the time of the September 2010 disclosure of fraud, claiming a loss of $15,150. (Kim Decl., Ex. 3).

Both moving parties also assert that their claims are typical of those of the rest of the Class and that they will be adequate class representatives. (Fund Mem.[14] at 1; Burns Mem.[15] at 5). The Fund contends that, like other class members, it purchased FalconStor common stock during the Class Period in reliance on defendants' false statements and suffered injuries as a result. (Fund Mem. at 6). The Fund further contends that it would be an adequate class representative because its interests are aligned with those of the Class, its proposed lead counsel is experienced and able to conduct the litigation, and there is no evidence to suggest that

there is any antagonism between the Fund's interests and those of the Class. (*Id.* at 7). Indeed, the Fund contends that the PSLRA was intended to encourage institutional investors, such as the Fund, to participate in securities class actions " 'predicting that their involvement would significantly benefit absent class members.' " (*Id.* at 7 (quoting *In re Cendant Corp. Litig.*, 264 F.3d at 273–74 (citing H.R. Conf. Rep. No. 104–369, at 34 (1995)))). The Fund also asserts that the legislative history of the PSLRA demonstrates Congress' preference for institutional lead plaintiffs. (Fund Further Mem.[16] at 5–6 (quoting House Conf. Rep. No. 104–369, 104th Cong. 1st Sess. at 34 (1995), 1995 U.S.C.C.A.N. 730, 733 (noting that "[t]he Conference Committee believes that ... with pension funds accounting for $4.5 trillion or nearly half of the institutional assets ... institutional investors and other class members with large amounts at stake will represent the interests of the plaintiff class more effectively than class members with small amounts at stake")))). Finally, the Fund argues that since it is an institutional investor, it is accustomed to acting as a fiduciary and that, with its legal and financial experience, it will be able to serve the Class better than plaintiff Burns. (Fund Further Mem. at 5).

Burns contends that the Fund's status as an institutional investor does not automatically entitle it to appointment as lead counsel because such a theory would render the procedures set by the courts irrelevant. (Burns Opp. at 5–6; *see also In re Vonage Initial Public Offering Sec. Litig.*, No. 07 CV 177, 2007 WL 2683636, at *11 (D.N.J. Sept. 7, 2007) (rejecting the argument that status as institutional investor trumps financial stake factor)). Burns argues further that, since the Fund cannot establish any financial dam-

---

**13.** The Fund noted in its Response that the two sales on May 6, 2010 only appear identical due to rounding of the share price to two decimal places. (Fund. Resp. at 3 n. 1).

**14.** Citations to "Fund Mem." refer to the Memorandum in Support of the Motion of Rochester Laborers Pension Fund for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, dated November 30, 2010.

**15.** Citations to "Burns Mem." refer to the Memorandum of Law in Support of Motion of William

Burns for Appointment as Lead Plaintiff and Approval of Lead Plaintiff's Selection of Counsel, dated November 30, 2010.

**16.** Citations to "Fund Further Mem." refer to the Memorandum of Law in Further Support of the Motion of Rochester Laborers Pension Fund for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, and in Opposition to the Competing Motion, dated December 17, 2010.

ages stemming from the actual revelation of the fraud on September 29, 2010, the fact that the Fund is an institutional investor is irrelevant. (Burns Opp. at 5–6). Mr. Burns therefore claims to be the most adequate lead plaintiff because he incurred the largest financial loss stemming from the revelation and has the largest stake in this litigation. (*Id.*)

Mr. Burns also claims to satisfy the Rule 23 requirements. Like the other members of the Class, Burns purchased the Company's shares at artificially inflated prices as a result of defendants' misstatements. Thus, he has a "strong desire" to prosecute this claim, and he is unaware of any unique defenses that would render him an inadequate Class representative. (Burns Mem. at 5–6).

The Fund contends that where, as here, there are competing applications for lead plaintiff, the Court should not engage in a comparative review of the two competing applications. " 'Rather, the Court should consider the motions sequentially, from greatest to smallest loss, applying the presumption that the plaintiff with the greatest loss should be the lead plaintiff, unless and until that presumption is rebutted by a showing that plaintiff does not meet the Rule 23 criteria.' " (Fund Reply [17] at 2 (quoting *In re Host Am. Corp. Sec. Litig.*, 236 F.R.D. 102, 105 (D.Conn.2006))). In this case, it is clear that the Fund claims a greater numerical loss than that of Mr. Burns; Mr. Burns does not appear to dispute this assertion. (Burns Opp. at 2). Accordingly, the Court first considers whether the Fund meets the Rule 23 criteria.

### 1. *The Fund as an "In and Out" Trader*

In opposing the Fund's appointment as lead plaintiff, Burns contends that the presumption in favor of choosing the representative with the greatest financial interest is rebutted because the Fund is a complete "in and out" trader, having purchased and sold all of its shares prior to any revelation of fraud on September 29, 2010. (*Id.*; *see su-*

*pra* at 235–36). Burns therefore asserts that the Fund "suffer[s] from unique adequacy and typicality defenses that may become the focus of the litigation" because, as an in-and-out trader, it cannot prove a causal connection between the alleged fraudulent conduct and its losses.

In *Dura Pharmaceuticals, Inc. v. Broudo,* the Supreme Court held that there must be proof of a causal connection between a securities plaintiff's loss and the defendant's fraudulent conduct. 544 U.S. 336, 345–46, 125 S.Ct. 1627, 161 L.Ed.2d 577 (2005); *see also In re Bally Total Fitness Sec. Litig.,* 2005 WL 627960, at *6 (stating: "Plaintiffs suing under the PSLRA must prove that the defendant's purported fraudulent statement or omission was the cause of their loss") (citing 15 U.S.C. § 78u–4(b)(4)). In proving loss causation, a party typically identifies a disclosure of the fraud that causes a drop in the price of the stock. If, however, "the purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have lead to any loss." *Dura Pharm., Inc. v. Broudo,* 544 U.S. at 342, 125 S.Ct. 1627.

In *In re Converse Technology, Inc. Securities Litigation,* the district court reversed the decision of the Magistrate Judge appointing an in-and-out trader as lead plaintiff, holding that losses incurred before the misconduct is disclosed to the public are not recoverable because they cannot be proximately linked to the misconduct. The court noted:

> In short, it is clear that under *Dura* and its progeny, any losses that [movant] may have incurred before [defendant's] misconduct was ever disclosed to the public are not recoverable, because those losses cannot be proximately linked to the misconduct at issue in this litigation. While the *Dura* Court decided a motion to dismiss, and not a lead plaintiff motion, the logical outgrowth of that holding is that any such losses must not be considered in the recov-

---

**17.** Citations to "Fund Reply" refer to the Reply Memorandum of Law in Further Support of the Motion of Rochester Laborers Pension Fund for Appointment as Lead Plaintiff and Approval of Selection of Lead Counsel, and in Response to the Opposition of William Burns, filed on December 27, 2010.

erable losses calculation that courts engage in when selecting a lead plaintiff.

2007 WL 680779, at *4 (citing *Kops v. NVE Corp.*, Nos. 06 CV 574, 06 CV 982, 06 CV 997, 2006 WL 2035508, at *5 (D.Minn. July 19, 2006)). The court explained that under *Dura*, a plaintiff seeking to establish loss causation cannot simply argue that the "defendant's misconduct artificially inflated the price of the target company's stock on the date the plaintiff purchased its shares." *In re Comverse Tech., Inc. Sec. Litig.*, 2007 WL 680779, at *4. There must be a showing that the "stock price later declined ... immediately following a *disclosure of the alleged misconduct to the public*." *Id.* (emphasis added). The court held that "losses result[ing] from 'in-and-out' transactions, which took place during the class period, but before the misconduct identified was ever revealed to the public" are not to be included in loss calculations. *Id.* at *3.

Many other courts have similarly considered loss causation in determining the appointment of lead plaintiff. *See, e.g., In re Veeco Instruments Inc. Sec. Litig.*, 233 F.R.D. 330, 333–34 (S.D.N.Y.2005) (considering plaintiff's inability to demonstrate loss causation in deciding appointment of lead plaintiff); *Kops v. NVE Corp.*, 2006 WL 2035508, at *5 (discounting in-and-out losses when deciding on lead plaintiff); *see also Arduini/Messina P'ship v. Nat. Med. Fin. Servs. Corp.*, 74 F.Supp.2d 352, 360–61 (S.D.N.Y.1999) (dismissing securities fraud claim where plaintiffs sold all of their stock before the fraud was disclosed, finding no loss causation); *In re Cardinal Health, Inc. Sec. Litig.*, 226 F.R.D. at 311 (denying appointment of a proposed lead plaintiff that would be subject to unique defenses because it retained so few shares at the end of the class period and left the amount of damage incurred an open question); *cf., Ellenburg v. JA Solar Holdings Co. Ltd.*, 262 F.R.D. 262, 268 (S.D.N.Y.2009) (holding that "selling shares during the class period does not disqualify a class member from being appointed

lead plaintiff," but noting that both potential lead plaintiffs in that case had acquired and sold a portion of their holdings during the class period).

The Fund contends that it is not an in-and-out trader because it sold its FalconStor shares only after a partial disclosure on January 14, 2010, revealing that the Company's preliminary fourth quarter and full year 2009 results would be far lower than previously forecasted. (Fund Reply at 3; Fund 6/21/11 Response at 1, 3). Following this disclosure, the Company's stock declined by 18% in a single day. The Fund asserts that the January disclosure "render[ed] the Company's earlier statements—which failed to disclose that the Company was experiencing weak demand for its products and services and that the Company was making improper payments to secure a contract with at least one of its customers [18]—materially false and misleading." (Fund 6/21/11 Response at 1). Although, the Fund concedes that there is "an additional fraud claim based on a subsequent disclosure later on in September, the Fund argues that the earlier January disclosure is also a fraud claim," resulting in a decline in the stock price of 18% in a single day. (Tr.[19] at 6; Fund Reply at 3; Compl. ¶¶ 29–30). The Fund argues that because it sold its shares after this partial disclosure, it would not be an in-and-out trader: "We would be considered to be an investor who no longer owned any shares at the very end of the class period." (Tr. at 29; *see also* Fund Reply at 4 (quoting *Montoya v. Mamma.com Inc.*, No. 05 CV 2313, 2005 WL 1278097, at *2 (S.D.N.Y. May 31, 2005))).

The Fund contends that "[l]oss causation 'does not require full disclosure and can be established by partial disclosure during the class period which causes the price of shares to decline.'" *In re Gen. Elec. Sec. Litig.*, No. 09 CV 1951, 2009 WL 2259502, at *4 (S.D.N.Y. July 29, 2009) (quoting *Montoya v. Mamma.com Inc.*, 2005 WL 1278097, at *2). Thus, courts have "routinely" appointed in-

---

**18.** The Court notes that, like earlier statements made by the Company, the January 2010 disclosure did not disclose the improper payments being made to a customer. That was not revealed until the September disclosure.

**19.** Citations to "Tr." refer to the Transcript of Civil Hearing, dated June 29, 2011.

vestors as lead plaintiff "when they sell their shares of stock after a partial disclosure and are not holding any shares at the time of a later disclosure." (Fund 6/21/11 Response at 4 (citing *Weiss v. Friedman, Billings, Ramsey Group, Inc.*, 2006 WL 197036, at *5 and quoting *Juliar v. SunOpta Inc.*, Nos. 08 CV 933, 08 CV 1070, 08 CV 1313, 08 CV 1496, 08 CV 1844, 08 CV 2034, 08 CV 2910, 2009 WL 1955237, at *7–8 (S.D.N.Y. Jan. 30, 2009)); *see also* Tr. at 29–30 (again citing *Juliar* )). In this case, the fact that the Fund "admittedly was not holding any shares of FalconStor stock at the time that the Company's disclosure of Mr. Huai's resignation caused a further decline in the price of FalconStor stock, [ ] should not detract from its adequacy or typicality to serve as lead plaintiff." (Fund 6/21/11 Response at 4).

In attempting to distinguish *Comverse* from the instant action, the Fund argues that in *Comverse* there was no prior partial disclosure. (Tr. at 20). However, the court in *Comverse* relied in part on the holding in *Kops v. NVE Corporation*, in which in-and-out losses were excluded from loss calculations after a partial disclosure. *In re Comverse Tech., Inc. Sec. Litig.*, 2007 WL 680779, at *3 (citing *Kops v. NVE Corp*, 2006 WL 2035508, at *5). Moreover, the other cases the Fund cites to support its arguments are distinguishable from this case and do not actually support appointment of the Fund as lead plaintiff.

For instance, in *Juliar*, even though the movant sold all of its shares prior to the corrective disclosure, there was a "substantial leakage" of the defendants' misconduct prior to the disclosure, including "the announcement of [defendant's] director [prior to the disclosure] that he would resign, a large increase in trading volume in the week prior to the [ ] corrective disclosure, and an analyst report … with adverse ratings of" the defendant company. *Juliar v. SunOpta Inc.*, 2009 WL 1955237, at *2. Based on these earlier disclosures, the court found that the movant had "adequately alleged partial disclosure of [defendant's] trouble prior to its [official] disclosure." *Id.*

Burns, however, argues that in this case, the January 14, 2010 disclosure was not actually "a partial corrective disclosure of any potentially illegal payments;" rather, the January announcement merely provided the Company's preliminary financial results for the fourth quarter and year-end results, stating that the miss was the result of lower than expected revenues from three original equipment manufacturers. (Burns Reply [20] at 2). Burns asserts that there was nothing in this January press release that hinted at the fraudulent conduct that ultimately formed the basis of these Complaints. (*Id.*) Indeed, while the Fund correctly noted that there was a significant decline in the stock price which prompted the Fund to sell its shares, it was not until eight months later, after the September announcement, that any lawsuit was filed. (Tr. at 13).

As already noted, the Supreme Court in *Dura* explained that although a misrepresentation or deception may cause an inflated purchase price, that alone does not constitute economic loss because if the purchaser sells the shares before the truth is known, there will be no loss caused by the misrepresentation. *Dura Pharm., Inc. v. Broudo*, 544 U.S. at 343, 125 S.Ct. 1627. If the purchaser sells before the disclosure, "an initially inflated price might mean a later loss," but the "lower price may reflect, not the earlier misrepresentation, but changed economic circumstances, changed investor expectations, new industry-specific or firm-specific facts, conditions, or other events, which taken separately or together account for some or all of that lower price." *Id.; see also Ruland v. InfoSonics Corp.*, 2006 WL 3746716, at *5.

Under this analysis, many courts have not considered losses suffered as a result of sales prior to the date of the disclosures. *See, e.g., Ruland v. InfoSonics Corp.*, 2006 WL 3746716, at *5; *Kops v. NVE Corp.*, 2006 WL 2035508, at *5 (explaining that a plaintiff who sold all of its shares before the truth was revealed suffered no loss unless there was a partial disclosure before the class period ended); *In re McKesson HBOC, Inc. Sec. Litig.*, 97 F.Supp.2d 993 (N.D.Cal.1999) (holding

---

**20.** Citations to "Burns Reply" refer to William Burns' Reply Memorandum of Law in Opposition to Competing Lead Plaintiff Motion, filed on December 30, 2010.

that it was inappropriate to count losses by "in-and-out" traders despite the argument that partial disclosures may have begun seeping into the market information).

In this case, the Fund has not alleged sufficient facts from which this Court can confidently infer that the January disclosure actually revealed fraud or misconduct sufficient to qualify as a partial disclosure. All that the Fund has alleged regarding the January disclosure is that the Company "announced that its preliminary fourth quarter and full year 2009 financial results would be far below its prior guidance" and that the January disclosure was a "partial disclosure of the truth." (Fund Further Mem. at 3; Fund Reply at 3; 6/21/11 Response at 1). As the Court noted during the oral argument, "[t]here was no disclosure in that January announcement that the reason [the company wasn't] making [its] projections was because [it] had engaged in fraud as opposed to the later announcement which was clearly an exposure of the fraud." (Tr. at 8). "[T]here may be other market factors like general economic factors that would cause a drop in earnings that had nothing to do with the fraud." (*Id.* at 11). Although the Fund's counsel responded that this is "not what we allege ... we believe that defendants had reason to know that these customers were not going to be placing orders" (*id.*), they have made no allegation that the public was aware, prior to the September disclosure, that the reason the Company was not making its projected revenues was because of the alleged fraud. Furthermore, as the Court noted during oral argument, the fact that the Fund waited four months, until May, to sell its stock supports the inference that the Fund was not aware of any fraud as a result of the January disclosure and therefore felt no urgency to sell. (*Id.* at 12–14).

In proving causation, there must be more than just a decline in price as a result of a disclosure by the company that the company is doing poorly; there must be some identification of a disclosure of the *fraud* that causes a drop in the stock price. If a "purchaser sells the shares quickly before the relevant truth begins to leak out, the misrepresentation will not have led to any loss." *In re Gen. Elec. Sec. Litig.*, 2009 WL 2259502, at *4 (quoting *Dura Pharm., Inc. v. Broudo*, 544 U.S. at 342, 125 S.Ct. 1627). Therefore, just because the stock price declined and the Fund sold its shares at a loss does not prove the loss was caused by the revelation of fraud, as required. As counsel for Mr. Burns noted during oral argument, the earlier disclosure itself "gives a lot of non-fraud explanations as to why they didn't meet the projections" and it:

> does not reveal the fraudulent conduct. It's very attenuated. [Counsel for the Fund] went through a long-winded explanation of how it could be plausible, how it may be plausible. There's a lot of dots to connect and that's one of the reasons in the cases that we've cited where you have a shareholder who's a complete in-and-out trader [that] courts have hesitated and, in certain circumstances, not appointed them as lead plaintiff.

(Tr. at 16–18).

In the present case, the Fund sold *all* of its shares and incurred all of its losses during the Class Period, but before the September 2010 revelation of fraud. (*See supra* at 235–36). However, if the district court later finds that the January announcement relating to projected revenues does not constitute a disclosure of fraud, none of the Fund's losses would qualify as proximately linked to the alleged fraud in this case. As Burns notes, "[s]hould the Court find at the pleading or summary judgment stage that loss causation has not been adequacy [sic] alleged or proven, the Fund would lack standing" to serve as the Class representative. (Burns 6/21/11 Letter at 2). Having considered all of the above, the Court is concerned that if the Fund, as lead plaintiff, is unable to prove loss causation and is found to lack standing, the entire case could be dismissed. At the very least, the appointment process would need to be repeated.[21] (*See* Tr. at 13, 26–29).

---

21. The Court notes that its concern here was confirmed by counsel for the various defendants, who made it clear at the end of the oral argument that they "will address any issues such as loss causation and the like that come up at the appropriate time, be it the motion to dismiss or

Even though there has not been full discovery in this case, the court in *Dura* held that courts should consider the issue of loss causation based "on the pleadings when faced with a pre-discovery motion." *In re Comverse Tech., Inc. Sec. Litig.*, 2007 WL 680779, at *5. Otherwise, "the court would be abdicating its responsibility under the PSLRA if it were to ignore that issue at this stage." *Id.* The court in *Comverse* went on to note that:

> it would be unfair to speculate that [the movant] will ultimately be able to demonstrate loss causation for its in-and-out transactions, despite its patent failure to allege facts in support thereof. Moreover, such a practice would encourage plaintiffs competing to lead a PSLRA litigation to overstate their losses at the outset of a lawsuit, in hope of a court's declining to look beyond those conclusory allegations until after discovery, when it might be too late to appoint a more deserving lead plaintiff.... The exclusion of in-and-our shares follows directly from the underlying holding in *Dura*.

*Id.*

Burns also argues that, even if there had been a partial disclosure that could result in recoverable damages, courts defer that question, finding it to be " 'too complicated at [the lead plaintiff appointment] stage of the litigation to make findings of fact regarding any potential partial disclosures and the effect, if any, these disclosures had on the price of the stock.' " (Burns Opp. at 4 (quoting *Ruland v. InfoSonics Corp.*, Nos. 06 CV 1231, 06 CV 1233, 06 CV 1309, 06 CV 1331, 06 CV 1378, 06 CV 1435, 2006 WL 3746716, at *5 (S.D.Cal. Oct. 23, 2006))); *see also In re Bally Total Fitness Sec. Litig.*, 2005 WL 627960, at *6 (refusing to appoint an "in and out" trader as lead plaintiff because it would have to establish that its losses were caused by the fraudulent statements, and would need to expend "considerable resources" to show that). Burns also asserts that "in and out" purchasers previously appointed as lead plaintiff

have been subsequently dismissed on summary judgment because they could not establish damages. (Burns Opp. at 5 (citing *In re Compuware Sec. Litig.*, 386 F.Supp.2d 913, 920 (E.D.Mich.2005))).

Having considered the parties' respective arguments, the Court finds that the Fund has failed to demonstrate that it will be an adequate lead plaintiff because it was a total in-and-out trader and may be unable to demonstrate loss causation. While the Court makes no finding regarding whether the January announcement relating to projected revenues constitutes a disclosure of fraud, it finds that the Fund is subject to unique adequacy and typicality defenses that render it an inadequate Class representative. Although "a lead plaintiff is not required to have standing to assert every possible claim" (Fund 6/21/11 Response at 5 (citing *Hevesi v. Citigroup, Inc.*, 366 F.3d at 82–83; *see also Weinberg v. Atlas Air Worldwide Holdings, Inc.*, 216 F.R.D. 248, 254 (S.D.N.Y.2003))), there remains the risk that the Fund will not be able to prove loss causation. If the "in-and-out" losses of the Fund are ignored, as some courts have done, *see, e.g., Ruland v. InfoSonics Corp.*, 2006 WL 3746716, at *6, and the focus is shifted to net number of shares purchased, or largest loss after the revelation of fraud, the Fund will not be able to show any loss causation and could be dismissed from the Class. If Fund is removed from the case or disqualified as a contender for lead plaintiff, then plaintiff Burns is the shareholder with the largest financial interest.

### 2. *Burns is the Best Choice for Lead Plaintiff*

The Court therefore considers whether plaintiff Burns is the best choice to represent the Class in this case. Mr. Burns suffered a significant loss totaling $15,150.00 as a direct result of the September disclosure; he complied with the procedural requirements of the PSLRA, and there appear to be no issues

class cert." (Tr. at 31). "It is appropriate to assume that after this day and later we will be making the argument with respect to loss causation and what was and was not a corrective disclosure in this matter, you know, with, with

great zeal." (*Id.*) However, the Court further notes that it is not making any determination, at this time, regarding whether the January disclosure qualifies as a disclosure of fraud or whether the Fund will be able to prove loss causation.

relating to typicality of adequacy under Rule 23. In Oral Argument, counsel for the Fund expressed concern that Mr. Burns would represent merely his own interests, or the interests of plaintiffs with claims similar to his, to the exclusion of those particular to other members of the class. (Tr. at 19). Specifically, the Fund asserts that because he is presently arguing that the January announcement did not constitute disclosure of fraud, Mr. Burns will not represent the interests of those plaintiffs who sold their shares after the January disclosure, but before the date of the September disclosure. (*Id.*) However, Mr. Burns made these arguments only in the context of his challenge to the appointment of the Fund as lead plaintiff. The Court fully expects that, as lead plaintiff in this case, Mr. Burns will represent the claims of the entire Class, including the Fund, with the same vigor he has demonstrated for pursuing his own claims, and nothing that he has done or asserted to date precludes him from doing so.

The Fund also argues that the better approach would be to appoint the Fund together with the initial plaintiff in the *Bensley* case, who held her stock during the entire Class Period. (*Id.* at 22). According to the Fund's counsel, the initial plaintiff is happy to be a Class plaintiff representing the interests of the investors who held stock through the end of the Class Period. (*Id.*) Although counsel did not know the precise amount of this individual's loss, he estimated it to be "[s]everal thousand dollars." (*Id.* at 23).

Mr. Burns' counsel noted in response that this individual shareholder never moved for appointment as lead plaintiff, nor did the Fund file for a joint motion, including her as a potential lead plaintiff. (*Id.* at 24). As a result of the fact that she never filed a motion for appointment, the Court lacks any information on which to judge this individual's suitability to be lead plaintiff and indeed, the only basis for concluding that she even wishes to undertake the responsibility of being lead plaintiff was a suggestion by the Fund's counsel at oral argument. Therefore, the Court does not find this suggestion to be an appropriate solution here. The Court hereby appoints plaintiff Burns as the lead plaintiff in this case.

### C. *Appointment of Lead Counsel*

Under the PSLRA, "[t]he most adequate plaintiff shall, subject to the approval of the court, select and retain counsel to represent the class." 15 U.S.C. § 78u–4(a)(3)(B)(v). Burns has selected the Rosen Law Firm (the "Firm") and seeks court approval of this selection. (Burns Mem. at 6–7). In support of Burns' request, Phillip Kim, Esq., of the Firm has submitted a Declaration, accompanied by an attachment entitled "The Rosen Law Firm P.A. Biography." In the Biography, the Firm has provided a detailed description of the educational background and legal experience of five attorneys in the Firm, along with a listing of 24 securities cases in which the Rosen Firm participated as lead or co-lead counsel. In addition, the Biography lists nine currently pending securities cases in which the firm is serving as lead counsel. (Kim Decl., Ex. 4). As the court in *In re Fuwei Films Securities Litigation* concluded, based on the Firm's experience, "the Rosen Law Firm is well-qualified to serve as lead counsel in this matter." 247 F.R.D. at 439.

Accordingly, the Court approves Burns' selection of the Rosen Law Firm as lead counsel.

### CONCLUSION

Having considered the submissions of both parties, as well as the oral argument, the Court appoints William Burns as Lead Plaintiff and the Rosen Law Firm as Class Counsel in this case.

The next conference in this case is scheduled for **September 15, 2011 at 12:30 P.M.**

The Clerk is directed to send copies of this Order to the parties either electronically through the Electronic Case Filing ("ECF") system or by mail.

**SO ORDERED.**